PAUL A. BONIN, Judge.
| [David L. Miller appeals his conviction for the second degree murder of Curtis Timmons, a violation of La. R.S. 14:3o.!.[1] Mr. Miller assigns three errors. He first asserts that the evidence was insufficient to sustain the guilty verdict. Second, Mr. Miller argues that the trial judge erred when she permitted the prosecution to elicit testimony from a NOPD homicide detective concerning the detective’s understanding of justifiable homicide. Third, Mr. Miller argues that the trial judge erred when she granted the prosecution’s challenge for cause of a venireman, and in denying him the right to conduct further voir dire of the venireman in chambers during the jury selection conference.
We have reviewed Mr. Miller’s first assignment under the well-known Jackson v. Virginia standard. Conceding that he shot Mr. Timmons, Mr. Miller does not argue that the essential elements of second degree murder were not proven beyond a reasonable doubt. Rather, Mr. Miller asserts that the prosecution failed to prove beyond a reasonable doubt that his actions were not justifiably taken in self-defense. We conclude, after viewing the facts in the light most ^favorable to the prosecution, that any rational trier of fact could find that the prosecution proved each and every essential element of the offense of second degree murder beyond a reasonable doubt, and that Mr. Miller’s killing of Mr. Timmons was not justifiable.
Alternatively, Mr. Miller argues that the jury erred in failing to return a verdict of the lesser offense of manslaughter because he showed by a preponderance of the evidence that his killing of Mr. Timmons was committed in a sudden heat of passion, or heat of blood, caused by provocation sufficient to deprive an average person of his self-control and cool reflection. After reviewing the judgment, we conclude that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that Mr. Miller did not prove the mitigating factors entitling him to a judgment of manslaughter by a preponderance of the evidence. See State v. Lombard, 486 So.2d 106, 110-111 (La.1986); State v. Pernell, 13-0180, p. 9 (La.App. 4 Cir. 10/2/13); 127 So.3d 18, 26.
We have reviewed Mr. Miller’s second assignment of error under an abuse of discretion standard and conclude that the trial judge erred when she allowed the prosecution to elicit testimony from an investigating detective which, in essence, conveyed to the jury his opinion on Mr. Miller’s guilt. Despite this finding, we conclude, in light of the record, that this error was harmless, thus precluding our reversal of Mr. Miller’s conviction and sentence on this basis.
|RWe have, likewise, reviewed Mr. Miller’s third assignment of error under the abuse of discretion standard and conclude that the trial judge did not abuse her discretion in granting the prosecution’s challenge for cause or in denying his request to conduct additional in chambers voir dire of the prospective juror. In addition, we have examined the entire record for errors patent and have detected none bearing upon the Mr. Miller’s conviction.[2]
*1075 Accordingly, we affirm Mr. Miller’s conviction and sentence. We explain our decision in greater detail below.
I
A
On June 7, 2012, an Orleans Parish Grand Jury indicted Mr. Miller for the second degree murder of Mr. Timmons, a violation of La. R.S. 14:30.1. Trial before a twelve-person jury was held on January 30-31, 2013, and Mr. Miller was found guilty as charged.[3] Mr. Miller filed a motion for new trial on March 7, 2013, which was denied prior to sentencing on November 8, 2013. The trial judge subsequently sentenced Mr. Miller to life imprisonment at hard labor, without [4benefit of parole, probation, or suspension of sentence. Mr. Miller then sought timely appellate review of his conviction.
B
David Miller shot and killed Curtis Tim-mons on June 23, 2010. The genesis of Mr. Timmons’s killing was a dispute between neighbors over the inadvertent blowing of grass clippings into the yard of Shawne Proctor, Mr. Timmons’s girlfriend. Mr. Miller, who resided at 5189 Basinview Drive in New Orleans, testified that he owned and operated, along with two employees, a lawn cutting business that serviced approximately twenty-two rental units and fifteen homes in the area. Mr. Miller had no contract for service, however, with the owner of Ms. Proctor’s rental unit, which was located at 5181 Basinview Drive.
Mr. Miller testified at trial that, on June 23, 2010, he and his employees were working on lawns at the opposite ends of the street, when he observed one of his employees walk across the street to his truck which was parked in the driveway of a customer who also resided on Basinview. Mr. Miller testified that he saw the employee take a blower from the truck. Mr. Miller tried, unsuccessfully, to let the employee know that it was not time to use the blower. Mr. Miller testified that he then got onto his riding mower and began to drive down the street so as to speak with his employee. According to Mr. Miller, as he approached the scene he could hear nothing, although he saw Ms. Proctor standing and throwing a hand up in the air. When he arrived at the scene, Mr. Miller asked Ms. Proctor what was going on. According to Mr. Miller, Ms. Proctor then began to curse and verbally attack | Rhim. Mr. Miller testified that Ms. Proctor stated: “You all want to cut some, some mother f — ing grass around here, you all are going to cut it all.... You all putting grass all over my door and everywhere.” Mr. Miller testified that he told Ms. Proctor that he could get his men to clean the grass clippings and leave. Ms. Proctor, according to Mr. Miller, declined the offer and instead continued to curse him. Mr. Miller testified that he then told his men to take their equipment and leave.
*1076 Mr. Miller also testified to noticing an unknown male, identified at trial as Ms. Proctor and Mr. Timmons’s friend, Jer-main Cole, open Ms. Proctor’s front door wider with his hand behind his back. At this point, Mr. Miller testified, he became fearful and began to walk away, telling Ms. Proctor, who was still cursing, to call the police if they could not solve the problem by themselves.
Mr. Miller noted that Mr. Cole had now walked outside to join Ms. Proctor. Mr. Miller then called 911, reported Ms. Proctor’s threats, and asked for the- police to come out and “see what’s going on with her.” 911 call records, which were introduced into evidence at trial by the prosecution, indicate that Mr. Miller first called 911 at approximately 2:28 PM. In the call, which was recorded and played for the jury, Mr. Miller characterizes the incident accordingly: “Uh, yeah, I need a police officer over here on, on 5189 Basinview. I got a stinking-ass whore over here trying to mess with me but I will kill her, I’m telling you now.” After informing the operator that the woman was someone who lived next door,[4] Mr. |fiMiller stated that Ms. Proctor came out of her apartment cursing at him and his workers and “acting crazy.” In response to the operator’s questioning, Mr. Miller described Ms. Procter and added gratuitously that Ms. Proctor wasn’t going to “threaten him.”
Before the police arrived, Mr. Cole approached Mr. Miller and, according to Mr. Miller, asked him why he and his men were “f — ing with my auntie?”[5] Mr. Miller testified that he told Mr. Cole that he did not know him and that he had better ask Ms. Proctor about what was going on. Mr. Miller stated that before he walked away, Mr. Cole told him that he would be back. Mr. Miller then went and sat on his lawnmower for a moment. Testifying that he did not know what was going to happen, Mr. Miller then went into his house and retrieved his .22 caliber handgun for protection and again called 911.
In this second call to 911, which occurred at 2:89 PM, Mr. Miller states: “Uh, I ain’t taking nothing off nobody. Yeah, they got a guy down here trying to f— with me in my neighborhood.” After again telling the operator his address, Mr. Miller told the operator that he was armed with a gun and that “they tried to jump me.” Mr. Miller then described what he was wearing and told the operator that he was outside in the street.[6]
After calling 911, Mr. Miller testified that Mr. Cole and Ms. Proctor remained outside on the opposite side of the street and that Ms. Proctor kept coming to the edge of her driveway asking: ‘You going to shoot somebody? You |7know, you mother f — ing, you going to do this to me? Shoot me if you’re going to shoot somebody. You shoot me.” Mr. Miller also testified that Ms. Proctor kept jumping up and down in the street and saying “Shoot me. Shoot me.”
Mr. Miller stated that at this point he told Ms. Proctor that he did not want to speak with her. Mr. Miller testified that he then raised his hand in the air, told her to go back across the street and asked her to tell Mr. Cole to come out and talk to him. Ms. Proctor refused Mr. Miller’s orders. According to Mr. Miller, he then told Ms. Proctor that if Mr. Cole did not come out into the street and speak with *1077 him, he was going to come and get him. Mr. Miller testified that the police arrived as he began to walk towards Ms. Proctor and Mr. Cole.
Ms. Proctor, however, relayed a very different version of events to the jury. Ms. Proctor testified that she was not working on June 23, 2010, and was home the entire day. Mr. Timmons, her boyfriend of twelve years and with whom she resided, was at work. Ms. Proctor stated that on that morning Mr. Miller and his workers were cutting grass, something she had seen them do before in the neighborhood. Although Mr. Miller and his workers had never before cut grass for her, they inadvertently cut part of her lawn on that day. Ms. Proctor testified that she then went outside and asked one of Mr. Miller’s workers if she could pay him to cut the rest of her grass. Ms. Proctor stated that Mr. Miller then approached her and began to curse with profane language. Noting that Mr. Miller “went on and on,” Ms. Proctor testified to cursing Mr. Miller back as well. Ms. Proctor stated 18that she then called Mr. Timmons and told him that she had gotten “into it” with Mr. Miller.
According to Mr. Cole, he subsequently received a call from Mr. Timmons about the incident. Mr. Cole testified that he then rode his son’s bicycle from his home, which was approximately two blocks away, to Ms. Proctor’s home. Mr. Cole testified that when he arrived at Ms. Proctor’s house “she was talking loud and crazy.” After speaking with Ms. Procter, Mr. Cole approached Mr. Miller, who was cutting grass. According to Mr. Cole, Mr. Miller told him: “If you know if God love you, you know, you’re going to go back by your people.” Realizing that he could not speak with Mr. Miller, Mr. Cole walked back toward Ms. Proctor. Mr. Cole then testified that he watched Mr. Miller ride on a lawn mower over to his pick-up truck, which Mr. Cole estimated was parked two residences past Ms. Proctor’s residence. According to Mr. Cole, Mr. Miller then came back with a gun, which he waived around, saying: “You all come here, you know, come outside, I’m going I’m going to show you all.” Mr. Cole also testified that Mr. Miller called him a “bitch ass,” and said “I’ll kill one of y’all, and all that like.” Mr. Cole testified that, at this point, he believed that Mr. Miller was going to kill him.
Similarly, Ms. Proctor testified that at this point Mr. Miller was “wagging” the gun and “talking about what he was going to do.” When asked what he was saying, Ms. Proctor testified: “[He was c]ursing and saying, like, you know, I know I’ll kill you all, I’ll — it was just on and on. He was just going off.” Ms. |9Proctor also testified that Mr. Miller came all the way into her driveway with the gun before she and Mr. Cole retreated into her residence. Ms. Proctor called the police at this time.
The prosecution introduced evidence which indicates that Ms. Proctor called 911 to report the disturbance at approximately 2:37 PM, two minutes prior to Mr. Miller’s second call. On the call, which was played for the jury, Ms. Proctor initially states to the operator: “How you doing ma’am? We have an incident over here with a man, he’s cutting the grass outside in front of everybody’s yard and he done pulled a gun. Went to his truck ma’am and pulled a gun and pointed it at everybody’s face so then everybody then ran in my house. He’s got the gun in his hand in the middle of the street.” Ms. Proctor also noted that Mr. Miller was “poihting a gun around” in front of children and that the argument started over grass cutting.
Mr. Miller testified that when the two police officers arrived — one male, the other female — he told them that Ms. Proctor had been giving him and his workers problems *1078 and had “threatened us with those other guys.” Mr. Miller testified that, in response to the male officer’s questions, he told them that he had a gun in his pocket. Mr. Miller stated that the officer then removed the bullets from the gun. Mr. Miller then observed the male officer walk across the street and speak with Ms. Proctor. The male officer returned and told Mr. Miller to have his men finish blowing the cut grass off of Ms. Proctor’s lawn. Mr. Miller testified that the female officer then told him that everything was going to be taken care of. Mr. |1(tMiller asked the officer about “the nephew that threatened” him and was told that Mr. Cole was ordered to leave the neighborhood. Before leaving, the officers put Mr. Miller’s now unloaded gun back into his truck.
Ms. Proctor, likewise, testified about her discussions with the police officers. Specifically, Ms. Proctor testified that after telling her to “get along as neighbors,” one officer asked her to identify the person with the gun. After telling the officer that Mr. Miller was armed, Ms. Procter testified to watching the police approach Mr. Miller, retrieve the gun, remove the cartridges and return the gun to him. The officers then told Ms. Proctor to go inside and ordered Mr. Cole to go home.
After the police left, according to Mr. Miller, he and his men went back to work on the various lawns on Basinview that they had yet to finish.[7] According to Mr. Miller, Ms. Proctor and her friends’ stayed outside, cursing at him and his workers whenever they would pass by. Also, Mr. Miller stated that, as Mr. Cole rode away on his son’s bicycle, he pointed at Mr. Miller and said, “I’ll be back for you.” Mr. Miller responded, “Don’t leave. Come on back now.”
Mr. Miller stated that while he and his men were finishing up their work he received a call from another client, who did not live on Basinview, asking him to come and pick up a check. Mr. Miller, accordingly, left area to pick up the check and used the opportunity to stop at his house on the way back and reload his pistol, which he placed in 'one of his pants pockets.
|nUpon returning, he began to help his men collect and bag grass clippings. As he was operating a blower, Mr. Miller noticed a white car with two occupants slowly drive the wrong way down Basin-view past he and his men. Mr. Miller became concerned that they were about to become the victims of a drive-by shooting. The white car stopped in front of Ms. Proctor’s residence. No one, according to Mr. Miller, got out of the car for three or four minutes. Still thinking that he was about to be the victim of a shooting, Mr. Miller kept constant watch on the white car while he pretended to blow grass clippings. Eventually, Mr. Miller saw an individual, later identified as Mr. Timmons, exit the vehicle wearing a hard hat and a uniform. Although Ms. Proctor was still outside, Mr. Timmons did not speak with her. As he stood in a client’s driveway and pretended to blow grass clippings, Mr. Miller watched Mr. Timmons begin to walk in his direction. Mr. Miller testified to thinking that Mr. Timmons might be going to a community mail kiosk, which was situated at a point between the two men. Mr. Timmons, however, did not stop at the mailbox but instead continued walking towards Mr. Miller.
As he pretended to operate the blower and keep an eye on Mr. Timmons’s ap *1079 proach, Mr. Miller turned and began to walk up a driveway towards a client’s front door. When Mr. Timmons had reached the driveway, he shouted at Mr. Miller, whose blower was still on, to get his attention. According to Mr. Miller, Mr. Tim-mons asked to speak with him. Mr. Miller responded, ‘Yeah, Yeah, man. What’s going on? What can I do for you?” Mr. Timmons then asked Mr. Miller |iaabout what had happened between him and Ms. Proctor. According to Mr. Miller, he told Mr. Timmons that nothing had happened between him and Ms. Proctor. He also told Mr. Timmons that the police had been there and resolved the issue and that, “if you got anything to say, you need to go down the street and talk to your old lady.” Mr. Timmons, however, insisted that he wanted to speak with Mr. Miller about it. Mr. Miller replied, “Man, please do me a favor. Would you please turn around and leave me alone, and go about your business, because the police done been there.” Mr. Miller testified that he repeated this request to Mr. Timmons three times even though Mr. Timmons had begun to yell and curse at him. Mr. Miller stated that he then told Mr. Timmons that he could stand outside and talk all day but that he had a job to finish.
Mr. Miller then turned the blower up and his back to Mr. Timmons. According to Mr. Miller, Mr. Timmons then struck him in the head with the hardhat, knocking him to the ground. Mr. Timmons, according to Mr. Miller, also started to beat and hit him in the chest and face. Mr. Miller also testified that Mr. Timmons grabbed the straps to his leaf blower, which he wore over his shoulder, and dragged him out into the street. Mr. Miller testified that, because the leaf blower was still strapped to his back, he could not get up or reach his pistol, which was in a back pocket of his pants. Mr. Miller claimed that, as a result of the beating, he was unable to see with one of his eyes because it was full of sweat and blood from a cut above the eye.[8] Mr. Miller testified that eventually he looked up [,sand saw Ms. Proctor standing over him holding a knife.[9] At this point he was able to get himself free of the blower and get his gun out of his pocket. Mr. Miller testified that when Ms. Proctor first saw his gun, she yelled, “He’s got a gun,” and then ran away. Mr. Miller stated that he started firing his gun rapidly as Mr. Timmons was “backing up.” On cross-examination, however, Mr. Miller insisted that he did not know whether or not Mr. Timmons was facing him.[10] Elsewhere, Mr. Miller insisted that, unlike Ms. Proctor, Mr. Timmons did not run but was instead getting up off the ground when he began to shoot. Mr. Miller testified that although he had once been a security guard, who received firearms training, he did not know where his shots struck Mr. Mffler.[11]
Mr. MiUer further noted: “After the shooting, I was standing there, and the *1080 gentleman, he was standing up. He was standing up against the car. And he told me, ‘Man, you done shot me.’ ” Mr. Miller testified that he then told Mr. Timmons to “be still,” because Mr. Timmons kept coming towards him even after he was shot and that he was going to call an ambulance for him.[12]
Mr. Miller also testified to hearing Ms. Proctor call out for others to come from her house because of the shooting. Thinking that more people were about to | uenter the fight, Mr. Miller ran back to his house and reloaded his pistol. On cross-examination, Mr. Miller testified that his gun held nine bullets and that he emptied six spent casings out of the gun before reloading. The police arrived at the location of the shooting just as Mr. Miller was running back out of his house into the street. Mr. Miller testified that he then threw his hands in the air, shouted to the police that he was the man they were looking for, and complied with their request to lie down on the ground. By the time the ambulance arrived, however, Mr. Timmons had died.
Ms. Proctor testified that she had witnessed the shooting. According to Ms. Proctor, after the police left the scene for the first time, Mr. Miller drove in his truck behind Mr. Cole as he left the neighborhood on his bicycle. She and a friend, consequently, followed both men to ensure that nothing happened to Mr. Cole. When she returned to her home, she went back inside only to come back outside some time later to see Mr. Miller and Mr. Timmons fighting. She started to walk towards the two men. Ms. Proctor testified to assuming that the fight had ended because she saw Mr. Timmons walking away as she approached. Ms. Proctor stated that Mr. Miller, on the other hand, was “wagging” his gun and began to shoot. Although she could not say whether or not Mr. Timmons was facing Mr. Miller at the time, Ms. Proctor testified that after the first shot Mr. Timmons, who was still standing, grabbed his side and said, “He shot me.” Ms. Proctor testified that Mr. Miller then shot Mr. Timmons a second time, at which point Mr. Timmons fell down. Ms. Proctor testified that she then watched Mr. Miller stand llover Mr. Timmons and shoot him a third time. At this point, Ms. Proctor testified that Mr. Miller told her, “You’d better get out of my way, cause you’re next.” After this, Ms. Proctor ran to her house and called 911 to report the shooting.[13]
A forensic examination of Mr. Timmons by Dr. Michael Defatta, who was accepted by the trial judge as an expert in the field of forensic pathology, established that Mr. Timmons suffered multiple injuries.[14] Dr. Defatta testified that Mr. Timmons sustained abrasions or scrapes on his chest, right hip, knees, and on the back of his right elbow. He opined that these injuries indicate that Mr. Timmons’s body suffered a “blunt force trauma” as a result of having come in contact with a rough surface. He testified that these injuries were consistent with a fight or a struggle where the person is thrown to the ground.
While he could not deduce the order in which the three bullet wounds were incurred, Dr. Defatta testified to recovering three bullets from Mr. Timmons’s body. What Dr. Defatta labeled as gunshot wound “A” entered the left side of the *1081 back of Mr. Timmons’s head, behind the ear, and became lodged in the mastoid bone. Dr. Defatta testified that the direction of gunshot wound “A” was left to right and back to front and doubted that this wound would have caused Mr. Tim-mons to lose consciousness.
Gunshot wound “B,” Dr. Defatta testified, struck Mr. Timmons in the left middle back, an inch off the midline. Dr. Defatta stated that this bullet proceeded |1fifor a short distance through the soft tissue of the back into a thoracic vertebra, transecting the spinal cord. He also stated that the trajectory of this bullet was from back to front and deduced that the shooter was standing behind Mr. Timmons at the time the shot was fired. Dr. Defat-ta noted that it was more likely than not that gunshot wound “B” paralyzed Mr. Timmons from the waist down, making it impossible for him to stand.
Dr. Defatta also testified that gunshot wound “C” entered the left lower back, approximately five inches left of the mid-line, and traveled into the bowel cavity, perforating the left kidney and the left lobe of the liver, before coming to rest in the soft tissue of the abdomen. Dr. Defat-ta noted that gunshot wound “C” was a lethal wound, due to blood loss, and that its direction was back to front, left to right, and upward. He testified that a person “perhaps” would have been able to walk after receiving gunshot wound “C.” Dr. Defatta also noted that none of the three wounds showed any signs of stippling, soot, or searing and that he, therefore, classified them as distance wounds. He stated that distance wounds indicate that Mr. Miller was standing at least thirty-six to forty-three inches away from Mr. Tim-mons when he discharged the gun.[15]
Dr. Defatta also observed a cluster of small, superficial wounds on the upper right side of Mr. Timmons’s back from which he extracted several small metallic fragments. Categorizing them as shrapnel wounds, Dr. Timmons stated these injuries occur when a bullet strikes a hard surface, fragments into multiple pieces, |17which in turn ricochet into a nearby person. Dr. Defatta agreed with the prosecution’s proposition that these shrapnel wounds were consistent with injuries that could occur when one person shoots at an individual who is lying on the ground.
The prosecution also introduced the testimony of several investigating police officers, the paramedic who attended to Mr. Miller after his arrest, and the Custodian of Records for New Orleans Police Department’s 911 system. Of note, paramedic Christine Guidry testified that she attended to Mr. Miller after his arrest. She first encountered Mr. Miller at 7:50 PM, several hours after the incident. Ms. Guidry noted in her assessment of Mr. Miller’s condition that all “signs were normal.” She also testified that she observed no injuries to Mr. Miller’s body and that he complained of no injuries or pain stemming from the fight.[16] When asked if he wanted to be taken to a hospital to be examined by a doctor, Mr. Miller declined. Similarly, Detective Ryan Aucoin testified that he assisted the NOPD’s lead detective on Mr. Miller’s case with the collection of evidence. Detective Aucoin also spoke with Mr. Miller at police headquarters after the incident, but before Mr. Miller invoked his right to counsel. Significantly, Detective *1082 Aucoin noted that Mr. Miller, while at police headquarters, did not exhibit or complain of injuries aside from backache. Likewise, Detective Aucoin testified that he saw no |18bIood on Mr. Miller. Mr. Miller, however, testified that he cleaned his face when he went back to his garage to reload his pistol.
II
In his first assignment of error, Mr. Miller asserts several interrelated sufficiency of the evidence challenges. We examine these challenges at the outset, because a reviewing court should first address sufficiency questions then proceed to those assignments as to one or more trial errors. See State v. Marcantel, 001629, p. 8 (La.4/3/02); 815 So.2d 50, 55; State v. Shaw, 07-1427, p. 15 (La.App. 4 Cir. 6/18/08); 987 So.2d 398, 407. Specifically, Mr. Miller does not dispute that, viewing all evidence in the light most favorable to the prosecution, any rational trier of fact could find beyond a reasonable doubt that he killed Mr. Timmons while having the specific intent to kill or to inflict great bodily harm. Instead, Mr. Miller argues that the jury erred when it concluded that the prosecution had proven beyond a reasonable doubt that he did not act in self-defense. He alternatively argues that the jury erred in failing to return a verdict of the lesser included offense of manslaughter because he showed by a preponderance of the evidence that his killing of Mr. Timmons was committed in a sudden heat of passion, or heat of blood, caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
[[Image here]]
We first consider the essential elements of the offense for which Mr. Miller has been convicted — second degree murder. In Louisiana, “[hjomicide is the 113killing of a human being by the act, procurement, or culpable omission of another.” La. R.S. 14:29. Criminal homicide is of five grades, one of which is second degree murder. As applied to this case, second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. See La. R.S. 14:30.1. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” See La. R.S. 14:10(1).
A homicide is justifiable, however, “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20 A(l); see also La. R.S. 14:18(7) (the defense of justification can be claimed “[w]hen the offender’s conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22”). Accordingly, “[t]he fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct.” La. R.S. 14:18 (emphasis added).
There are, thus, two components necessary to invoke this defense of justification under Article 20 A(l): the defendant’s reasonable belief that he is in imminent danger of losing his life or receiving great bodily harm, and that the killing of the other person is necessary to save himself from that danger.[17] When a Lndefendant in a homicide prosecution *1083 claims self-defense, the burden is on the prosecution to prove beyond a reasonable doubt that the defendant did not act in self-defense. See State v. Taylor, 03-1834, p. 7 (La.5/25/04); 875 So.2d 58, 63 (citing State v. Brown, 414 So.2d 726, 728 (La.1982)).
As noted, Mr. Miller also argues in the alternative that the jury erred in not finding him guilty of .manslaughter and asks us to enter a judgment on this lesser-included offense. See La.C.Cr.P. art. 814 A(3). The crime of manslaughter includes “a homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person 'of his self-control and cool reflection.” La. R.S. 14:31 A(l). But such provoked “sudden passion” or “heat of blood” are not elements of the offense of manslaughter. They are instead only mitigating factors which lessen the culpability of a defendant charged with second degree murder. See Lombard, 486 So.2d at 110; State v. Moore, 11-0025, p. 7 (La.App. 4 Cir. 9/7/11); 75 So.3d 22, 26.[18]
12,When a defendant claims, as here, that the trier of fact’s verdict of guilty of second degree murder is irrational and that he is entitled to a verdict or judgment of guilty of manslaughter, the burden of proof shifts to the defendant to establish by a preponderance of the evidence that he, having been sufficiently provoked, acted in “sudden passion” or “heat of blood.”[19] See Lombard, 486 So.2d at 111. “Where such proof has been introduced, a second degree murder verdict [or judgment] is inappropriate.” Id. That is, “[w]hen the preponderance of the evidence shows that a homicide was committed in sudden passion or heat of blood which would have deprived an average person of his self control and cool reflection,” a fact-finder, whether judge or jury, “errs in rendering a [judgment or] verdict of second degree murder.” State ex rel. Lawrence v. Smith, 571 So.2d 133, 136 (La.1990).
B
We turn now to examine the evidence adduced at trial. We first observe that the *1084 jury was confronted with two very different accounts of the events which lead to Mr. Timmons’s death and were, therefore, called upon to resolve several factual disputes.
According to Mr. Miller, Ms. Proctor responded with profanities and curses when he first approached her about the grass clippings in her yard. Mr. Miller further testified that after speaking with Mr. Cole, who likewise cursed him and used profanities, he felt unsure as to what was about to happen. This unease, according to Mr. Miller, is what led him to arm himself for the first time and call Igathe police to the scene. Shortly after the police left, however, Mr. Miller testified to still feeling that he was about to be attacked. Mr. Miller noted that after the police left, Ms. Proctor and several of her acquaintances, despite the police officers’ admonishments, continued to stand outside and taunt his men with curses and profane language. It was then that Mr. Miller decided to reload his pistol. He further testified that he grew more suspicious after Mr. Timmons came home from work, driving slowly the wrong way past he and his men only to park in front of Ms. Proctor’s residence.
As for the fight, Mr. Miller testified that Mr. Timmons approached him to speak and he, politely but firmly, rebuffed his efforts to talk. According to Mr. Miller, Mr. Timmons then began to curse him with profane language. Mr. Miller also testified that Mr. Timmons was the initial aggressor because he first struck him across the back of his head with a hardhat. Mr. Miller stated that Mr. Timmons then threw him to the ground, dragged him out into the street and began to beat him about the head and chest. Mr. Miller asserted that he was unable to defend himself because of the leaf blower on his back. He also claimed to have suffered injuries to one of his eyes that left him unable to see out of it. And Mr. Miller testified that it was only after he saw Ms. Proctor standing over him holding a knife that he was able to free himself of the leaf blower, reach his pistol in his pants pocket and defend himself. Mr. Miller, however, was equivocal with respect to his and Mr. Timmons’s relative positions at the time of the shooting. Mr. Miller, variously, stated that Mr. Timmons was backing up, moving side-to-side, or | ^getting off the ground at the time he fired the first shot. Mr. Miller did testify, however, that Ms. Proctor fled with her knife once she saw that he was armed. On the other hand, Mr. Miller could neither state where his various shots struck Mr. Timmons or whether Mr. Tim-mons was facing him at the time. Mr. Miller claimed that Mr. Timmons remained standing — walking towards him even — after he was shot. Mr. Miller also noted that after he shot Mr. Timmons, he emptied six spent casings out of his pistol before reloading.
Ms. Proctor, on the other hand, testified that, when she asked if she could pay Mr. Miller to mow her lawn, he responded with curses and profanity. Mr. Cole testified that after speaking briefly with Mr. Miller to no avail, Mr. Miller armed himself with a pistol, approached him and Ms. Proctor, waived the pistol about, and threatened them with curses and violence. Ms. Proctor, likewise, testified to Mr. Miller threatening her and Mr. Cole with profanities and violence.
Although Ms. Proctor stated that she did not witness the beginning of the fist fight between Mr. Miller and Mr. Tim-mons, she, nevertheless, claimed to have witnessed the shooting. According to Ms. Proctor, Mr. Miller began to shoot after the fight had ended and Mr. Timmons was walking away. Ms. Proctor noted that, after receiving the first shot, Mr. Tim- *1085 mons, who was still standing, grabbed his side and said, “He shot me.” Ms. Proctor next stated that Mr. Miller then shot Mr. Timmons a second time, at which point Mr. Timmons fell down. Ms. Proctor also testified to watching Mr. Miller stand over Mr. Timmons and shoot him a third time.
| ¡.¿Despite the differing factual accounts, the jury was presented with forensic evidence and testimony that was essentially unchallenged by Mr. Miller. Dr. Defatta testified to extracting three bullets from Mr. Timmons’s body — each of which entered Mr. Timmons’s body from his backside. Dr. Defatta further classified each gunshot wound as a “distance wound,” meaning that each shot was taken when Mr. Miller was at least thirty-six inches away from Mr. Timmons.[20] Gunshot wound “A,” which entered the left side of the back of Mr. Timmons’s head behind the ear and became lodged in the mastoid bone, would not have caused Mr. Timmons to lose consciousness.
Gunshot wound “B” struck Mr. Tim-mons in the left middle back, severing the spinal cord. Dr. Defatta noted that it was more likely than not that gunshot wound “B” paralyzed Mr. Timmons from the waist down, making it impossible for him to stand. Dr. Defatta also testified that gunshot wound “C” entered the left lower back, perforated the left kidney and the left lobe of the liver, only to stop in the soft tissue of the abdomen. Dr. Defatta testified that gunshot wound “C” was a lethal wound due to blood loss and that Mr. Timmons might have been able to walk after receiving gunshot wound “C.” Dr. Defatta also observed a cluster of small, superficial wounds on the upper right side of Mr. Timmons’s back from which he extracted several small metallic fragments. Categorizing them as 125shrapnel wounds, Dr. Defatta agreed with the prosecution’s proposition that these shrapnel wounds were consistent with injuries that could occur when one person shoots at an individual who is lying on the ground.
Additionally) the prosecution presented the jury with pictures of Mr. Miller’s hands, torso, and face, taken by the police after his arrest, which appear to contradict his claim that Mr. Timmons threw him to the ground and beat him savagely. The pictures do not reveal any apparent scratches, bruises, or cuts on Mr. Miller. Neither of Mr. Miller’s eyes appears to be damaged, bruised, or swollen and his blue work shirt, which he was still wearing when the pictures were taken, appears to be clean. According to the paramedic who treated him after his arrest, Mr. Miller complained of some pain associated with a recent hernia surgery — but nothing else. Mr. Timmons’s autopsy, on the other hand, indicated that he sustained several abrasions or scrapes to his chest, right hip, knees, and right back elbow. Dr. Defatta testified that these injuries were consistent with a fight or a struggle where the person is thrown to the ground.
C
The standard of review for sufficiency of evidence applicable to criminal convictions in state courts is set forth in Jackson v. Virginia. See generally 443 *1086 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See also State v. Mathews, 375 So.2d 1165, 1167-1168 (La.1979). This inquiry requires a reviewing court to determine “whether, after viewing the evidence in the light most favorable to the prosecution, any rational 1trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
There are several principles that guide our review under this well-known standard. First, we examine all of the evidence considered by the jury at trial. See id. Thus, we do not ignore evidence that was erroneously admitted or could have been excluded at trial, ie., inadmissible hearsay. See State v. Hearold, 603 So.2d 731, 734 (La.1992).
Second, all of the evidence is viewed in the light most favorable to the prosecution. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781; State v. Fields, 12-0674, p. 6 (La.App. 4 Cir. 6/19/13); 120 So.3d 309, 315. We are not limited to the admitted evidence alone, but may also consider all reasonable inferences from that evidence which the fact-finder could have made. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781. As such, when circumstantial evidence forms the basis of a conviction, such evidence must consist of “proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.” State v. Shapiro, 431 So.2d 372, 378 (La.1982).
Third, in evaluating a defendant’s challenge to the sufficiency of the evidence, we are restricted to those theories actually put forth by the defense at trial. See State v. Juluke, 98-0341, pp. 4r-5 (La.1/8/99); 725 So.2d 1291, 1293 (per cu-riam). A defendant may not simply develop a new theory on appeal and demonstrate that the evidence was insufficient to negate that new theory.[21] See id.
j 27Fourth, we are highly deferential to the findings of the trier of fact. See State v. Barthelemy, 09-0391, pp. 24-25 (La.App. 4 Cir. 2/24/10); 32 So.3d 999, 1015. In criminal cases our “appellate jurisdiction extends only to questions of law.” La. Const, art. V, § 10(B). It is “the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Jackson, 443 U.S. at 319, 99 S.Ct. 2781. See also State v. Smith, 11-0664, p. 4 (La.App. 4 Cir. 1/30/13); 108 So.3d 376, 381. The trier of fact may accept as true the testimony of any witness, even a single witness, and find such testimony sufficient to establish each element of an offense beyond a reasonable doubt. See State v. Sanchell, 11-1672, p. 6 (La.App. 4 Cir. 10/31/12); 103 So.3d 677, 680.
*1087 Our review will only impinge upon this fact-finding function to the extent necessary to assure compliance with Jackson v. Virginia. See State v. Macon, 06-481, p. 8 (La.6/1/07); 957 So.2d 1280, 1285. “The Due Process Clause of the Fourteenth Amendment, the source of the Jackson [v. Virginia ] standard, does not countenance, much less require, that we re-weigh testimony and witness credibility.” State v. Gilmore, 10-0059, p. 6 (La.App. 4 Cir. 10/6/10); 50 So.3d 208, 212-213. See also Jackson, 443 U.S. at 319, 99 S.Ct. 2781. We will only tread on a jury’s [^presumed acceptance of a witness’ testimony, when that testimony is implausible or clearly contrary to evidence. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988). See also State v. Marshall, 04-3139, p. 9 (La.11/29/06); 943 So.2d 362, 369 (“Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.”); State v. Robinson, 10-0885, pp. 7-8 (La.App. 4 Cir. 12/21/10); 54 So.3d 1208, 1213.
And lastly, we note that in our review of Mr. Miller’s alternative argument “this court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.” Lombard, 486 So.2d at 111. Therefore, if we conclude that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, “could only have found the defendant guilty of manslaughter,” then the conviction for second degree murder must be vacated. See Lawrence, 571 So.2d at 136 (emphasis added). And, under such circumstances, the court must render a conviction for the lesser included responsive judgment of manslaughter. See La,C.Cr.P. art. 814 A(3); Lombard, 486 So.2d at 111; Pernell, 13-0180, p. 8, 127 So.3d at 26.
D
Construing the evidence in the light most favorable to the prosecution, we find that any rational fact-finder could conclude that Mr. Miller was guilty beyond a reasonable doubt of second degree murder and that the prosecution proved 12¡,beyond a reasonable doubt that he did not act in self-defense. While Mr. Miller testified repeatedly that prior to the fight he was afraid that he might be jumped or become the victim of a drive-by shooting and that he feared for his life when, during his struggle with Mr. Timmons, he witnessed Ms. Proctor standing over him holding a knife, evidence presented to the jury, when viewed in the light most favorable to the prosecution, indicates that the shooting occurred after the fight had ended.
First, Mr. Miller testified that he took the first shot after Ms. Proctor had begun to run away and as Mr. Timmons was getting up off the ground or backing away. Ms. Proctor testified that she observed Mr. Miller begin to shoot after Mr. Tim-mons had begun to walk away from the fight. Second, the forensic evidence could also be interpreted to indicate that Mr. Miller shot at Mr. Timmons after the fight had broken up. This evidence, specifically, established that Mr. Miller shot at Mr. Timmons between four and six times. Three of Mr. Miller’s shots struck Mr. Timmons from behind. One of the shots struck Mr. Timmons in the lower back and pierced his left kidney and liver. Dr. De-fatta testified that this shot was fatal and would have been very painful. Another shot struck Mr. . Timmons in the back and severed his spinal cord. Dr. Defatta testified that this shot would have paralyzed. Mr. Timmons, preventing him from stand *1088 ing or walking.[22] A third shot struck Mr. Timmons behind the left ear and became lodged in his mastoid bone. Dr. Defatta also classified all of these shots as “distance wounds,” meaning that |snMr. Miller was at least three feet away from Mr. Timmons at the time the shot was fired. Mr. Miller testified at trial that the distance between he and Mr. Timmons was equivalent to the distance between the witness stand and the examiner’s podium.
Third, Ms. Proctor’s description of the shooting is consistent with Dr. Defatta’s testimony. Ms. Proctor specifically testified that Mr. Miller’s first shot struck Mr. Timmons’s side, the second shot struck his back, whereupon he fell to the ground, while the third shot occurred as Mr. Miller stood over Mr. Timmons and fired down at him. The jury was also presented with evidence that Mr. Timmons suffered several superficial shrapnel wounds, which were consistent with injuries that could occur when one person shoots at an individual who is lying on the ground. “[I]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion.” State v. Higgins, 03-1980, p. 6 (La.4/1/05); 898 So.2d 1219, 1226.[23] We observe that there is no “irreconcilable conflict with the physical evidence” and Ms. Proctor’s description of the shooting. Id.
Fourth, additional evidence presented to the jury indicated that Mr. Timmons’s body suffered several scrapes and abrasions consistent with someone being thrown to the ground as if in a fight. Photographs of Mr. Miller’s face, torso, | si and hands taken after the fight, on the other hand, reveal no apparent injuries. Likewise, the paramedic who attended to Mr. Miller after his arrest stated that he denied suffering any injuries and that, aside from some abdominal pain associated with a recent hernia surgery, seemed otherwise normal.
Any rational fact-finder, therefore, could have found beyond a reasonable doubt that, at the time Mr. Miller began shooting, he was not then in imminent danger of being killed or of receiving great bodily harm or that the killing of Mr. Timmons was necessary to save himself from that danger. Consequently, reviewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could find that the prosecution proved all elements of the offense, including that Mr. Miller did not act in self-defense, beyond a reasonable doubt.
E
We turn now to address Mr. Miller’s alternative argument that the jury erred in failing to return a verdict of the lesser-included offense of manslaughter because he showed by a preponderance of the evidence that his killing of Mr. Tim-mons was committed in a sudden heat of passion, or heat of blood, caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
In this case, as we have noted, the jury was repeatedly presented with competing *1089 accounts of the arguments between Mr. Miller and, variously, Ms. Proctor and Mr. Cole. We need not restate them, or the factual disputes the jury was called upon to resolve, again. Nevertheless, we note that there is very little ^evidence in the record from which to infer that Mr. Miller’s actions were committed in a sudden heat of passion or heat of blood. While it is true that he testified to being fearful of being attacked, Mr. Miller did not testify to being angry. While we are loath to characterize evidence, the recordings of his initial set of calls to 911 do not reveal him to be especially agitated, passionate, or angry even though he vowed repeatedly to kill Ms. Proctor. The recording of Mr. Miller’s call to 911 made after the shooting, conversely, reveals him to be greatly agitated and angry. It is also true that while Ms. Proctor and Mr. Cole’s characterizations of Mr. Miller paint him to be an argumentative blowhard, there is nothing in their descriptions of the incident from which to infer the cause of Mr. Miller’s temper. Similarly, although he testified that Mr. Timmons was the aggressor in the fight, striking him with his fists and hardhat, the physical evidence and the paramedic’s testimony indicate that Mr. Tim-mons was the only one of the two to suffer any types of scrapes or abrasions consistent with a fist fight.
And while Mr. Miller’s testimony that Mr. Timmons attacked and beat him could possibly be found by a jury to constitute provocation sufficient to deprive an average person of his self-control and cool reflection, we nevertheless note that the only evidence of provocation came from Mr. Miller himself, and the jury, in finding him guilty'of second degree murder, must not have found his testimony as to what transpired between him and Mr. Timmons to be credible. See State v. Santinac, 99-0782, pp. 6-7 (La.App. 4 Cir. 6/14/00); 765 So.2d 1133, 1137; State v. Byes, 97-1876, p. 9 (La.App. 4 Cir. 4/21/99); 735 So.2d 758, 764. We, | ^accordingly, conclude that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that Mr. Miller failed to prove by a preponderance of the evidence that there were mitigating factors in his killing of Mr. Timmons. Mr. Miller’s conviction for second degree murder was not irrational, and we decline to render a conviction for manslaughter as requested by Mr. Miller.
Ill
In this Part, we explain why the trial judge abused her discretion when she allowed the prosecution to elicit testimony from Detective Aucoin which, in essence, conveyed to the jury his opinion as to Mr. Miller’s guilt. Mr. Miller argues that the prosecution, by asking the detective first about how he would handle a case where he believed that the homicide was justified and then asking him whether he had handled the current case differently, essentially solicited the detective’s opinion as to whether Mr. Timmons’s killing was a justifiable homicide. He asserts that the trial judge’s allowance of this line of questioning constitutes an abuse of discretion which warrants a remand for retrial. Although we agree with Mr. Miller that the trial judge abused her discretion in allowing the prosecution to elicit this testimony, we conclude, in light of the record, that any error was harmless, or inconsequential, obviating the need for a reversal of Mr. Miller’s conviction and sentence.
_I§áA
We first examine the prosecutor’s line of questioning that was directed to Detective Aucoin. The record reveals that the prosecutor first asked Detective Aucoin to estimate the number of homicide investigations he had participated in. The detective *1090 testified that he had personally investigated sixty to sixty-five homicides as the lead detective and estimated that he had assisted in the investigation of over one-hundred-fifty to two-hundred others. The prosecutor then asked Detective Aucoin for his definition of justifiable homicide. Defense counsel then objected on the grounds that the prosecution was asking the detective for a legal conclusion. The prosecution responded that she was asking him, based on his experience as a homicide detective, how the NOPD defined the concept of justifiable homicide. The trial judge then cautioned the jury: “Ladies and gentlemen of the Jury, during the course of Jury instructions, I’ll read you the legal definition of Justifiable Homicide. I’ll allow Detective Aucoin to testify of his review through NOPD of what he considers to be Justifiable Homicide. That does not mean it’s the legal definition.”[24] Detective Aucoin then defined the concept accordingly: “Justifiable Homicide. It’s kind of a broad, a broad definition. But to put it in simple terms, the taking of the life of another human being, by another human being, where that individual feels that his life or another person’s life is in — is threatened or great bodily harm is threatened. Or to defend one’s self.”[25]
lasThe prosecutor then asked Detective Aucoin how he would assess a justifiable homicide scene. Over defense objection, Detective Aucoin then testified to a hypothetical situation wherein a homeowner shoots and kills a burglar and is not arrested because the homicide is deemed justified. The prosecutor then asked Detective Aucoin about what types of evidence he would examine at the scene in order to determine whether or not the homicide was justifiable. Defense counsel, again, objected, and the trial judge again cautioned the juiy: “I’m going to stress to you, ladies and gentlemen of the Jury, Detective Aucoin is not testifying as an expert. He’s testifying within his experience as a homicide detective. I’ll allow him to answer limited questions as to a hypothetical, without making any comments to the instant case.” Detective Au-coin then agreed with the prosecutor’s proposition that he would look at the totality of the circumstances in deciding whether the hypothetical homicide was justifiable.
The prosecutor then asked whether an arrest would be made of the hypothetical homeowner, and Detective Aucoin replied that it would not. When the prosecutor asked Detective Aucoin why the hypothetical homeowner had not been arrested, defense counsel objected on the grounds that the answer would give the jury the impression that the detective was an expert witness. The trial judge agreed, reiterating that the witness was not an expert, noting: “And I’ve already indicated that he can answer as to this hypothetical. But he’s not an expert. And I don’t need to repeat what I’ve already explained to the Jury.” The prosecutor rejworded36 her question, asking what would happen, to the hypothetical homeowner who killed the burglar. Detective Aucoin replied that a full investigation would be undertaken and that the homeowner would not be arrested if it was *1091 determined that the homeowner had the right to defend himself. Detective Aucoin added, however, that a report would be completed and the matter referred to the District Attorney’s Office, which ultimately would determine whether charges would be brought. The prosecutor immediately thereafter asked Detective Aucoin whether Mr. Miller was arrested at the scene of Mr. Timmons’s killing. Detective Aucoin testified that Mr. Miller was arrested at the scene, thus unmistakably leaving the jury with the conclusion that the investigating officers were of the opinion that Mr. Timmons’s Mlling was not justified.
Defense counsel later revisited the issue during his cross and re-cross examination of Detective Aucoin. During cross-examination, defense counsel asked Detective Aucoin if there were other ways, in addition to the prosecution’s hypothetical case, in which a homicide could be justifiable. Defense counsel then presented Detective Aucoin with an alternate hypothetical, over the prosecution’s objection, of an individual walking on Canal Street who is both attacked by someone and believes that his life is in danger. Defense counsel then asked whether this victim would be justified in defending himself. Detective Au-coin replied that he believed everyone had a right to defend himself, and in this situation the issue would be the degree of force used by the victim.
|S7On re-cross examination, defense counsel asked Detective Aucoin whether the concept of justifiable homicide requires a victim to first be injured before he acts or whether the victim needs to merely believe that he is reasonably certain that he is about to be injured, harmed, or killed. The detective agreed that the latter alternative “is what the law says.”
B
We review a trial judge’s ruling which admits the elicitation of non-expert opinion testimony under an abuse of discretion standard. See Higgins, 03-1980, p. 22, 898 So.2d at 1234. The only authority cited by Mr. Miller in support of his argument is Article 704 of the Louisiana Code of Evidence, which provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
(emphasis added).
The traditional rationale underlying Article 704’s prohibition on the introduction of such testimony was that such “evidence is not truly expert testimony because it relates to matters well within the jury’s understanding and is wholly without value to the trier of fact in reaching a decision; the inference or opinion is abstract and indirect; and it relates to an ultimate issue rather than a collateral matter.” State v. Wheeler, 416 So.2d 78, 81 (La.1982).[26]
|ssMr. Miller does not claim, however, that Detective Aucoin testified as an expert. Rather, Mr. Miller focuses on Article 704’s concluding sentence and asserts the cumulative effect of the prosecution’s line of questioning to Detective Au-coin was designed to slyly elicit an opinion as to the ultimate question on his guilt or innocence. We have on prior occasions *1092 concluded that Article 701 of the Louisiana Code of Evidence permits a police officer to express an opinion regarding matters of personal knowledge gained through experience, even if the officer is not first qualified as an expert. See, e.g., State v. Morgan, 02-1489, p. 13 (La.App. 4 Cir. 3/12/03); 842 So.2d 1126, 1134. We are unaware, however, of any Louisiana court which has allowed a police officer, whether qualified as an expert or not, to offer an opinion as to a defendant’s guilt or innocence. Rather, the jurisprudence has long held that “a witness is never allowed to express an opinion or suspicion as to the guilt or innocence of an accused.” State v. Chevallier, 213 La. 528, 533, 35 So.2d 135, 137 (La.1948), (citing State v. Borde, 209 La. 905, 911-912, 25 So.2d 736, 739 (1946); State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942); State v. Bessa, 115 La. 259, 38 So. 985 (La.1905); State v. Robertson, 111 La. 35, 35 So. 375 (La.1903); 2 Wharton’s Criminal Evidence 1658, Sections 944 and 945; Underhill’s Criminal Evidence 429, Section 230; and 20 AmJur. 633, Section 763).
Having examined Detective Au-coin’s testimony closely, both in light of this assignment and in connection with our Jackson review, we think that the insinuative thrust of the prosecution’s line of questioning could not possibly have | Mbeen lost on any rational juror — the police concluded that Mr. Miller did not act in self-defense because they did not process his case in the same manner as they would have a person whose action’s they deemed justified. We, accordingly, conclude that the trial judge abused her discretion when she allowed the prosecution to pursue this line of questioning.
C
But we must nevertheless determine whether this error requires reversal or whether we are convinced beyond a reasonable doubt that the error did not contribute to the jury’s verdict. We are without authority to reverse a ruling “which does not affect substantial rights of the accused.” La.C.Cr.P. art. 921. But “[w]e have both the power and the obligation to review the record de novo to determine an error’s harmlessness.” State v. Smith, 600 So.2d 1319, (La.1992); citing Arizona v. Fulminante, 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (emphasis in original). The question becomes whether we can declare beyond a reasonable doubt that the erroneous ruling did not contribute to the jury’s finding of guilt or whether the error is unimportant in relation to everything else the jury considered, as revealed in the record. See State v. Welcome, 458 So.2d 1235, 1244 (La.1983). Stated differently, the appropriate standard for determining harmless error is whether the guilty verdict was surely unattributable to the trial court’s error. See Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
In reviewing the record, however, we do not make credibility determinations or findings of fact; we are limited to determining whether the state has met its |4nburden of demonstrating that the erroneous ruling did not contribute to the defendant’s conviction. See State v. Ellis, 94-599, p. 25 (La.App. 5 Cir. 5/30/95); 657 So.2d 341, 354. Importantly, we emphasize that the burden of establishing harmlessness is in this case upon the prosecution and not upon the defendant. See State v. Lewis, 12-1021, p. 16 (La.3/19/13); 112 So.3d 796, 805.
After examining the record, we can declare beyond a reasonable doubt that the jury’s verdict was surely unattributable to the erroneous ruling. As should be clear from our restatement of the facts — which *1093 does not refer to Detective Aucoin’s opinion testimony — the remainder of the evidence adduced at trial was more than sufficient for any rational trier of fact to find that the prosecution proved all elements of the offense, including that Mr. Miller did not act in self-defense, beyond a reasonable doubt. We further observe that any error by the trial judge in allowing this line of questioning was limited by the trial judge’s admonishments and instructions. And we note that the trial judge afforded defense counsel full opportunity to cross and re-cross the detective on this issue. We, accordingly, conclude beyond a reasonable doubt that the erroneous ruling did not contribute to the jury’s finding of guilt. We will not reverse Mr. Miller’s conviction and sentence on account of a harmless error.
IV
We turn now to discuss Mr. Miller’s assertion that the trial judge erred when she granted the prosecution’s challenge for cause of a venireman and in denying him the right to conduct further voir dire of the venireman in chambers during the |41jury selection conference. He does not argue, specifically, that the trial judge’s granting of the prosecution’s challenge for cause was in error. Rather, Mr. Miller asserts that the trial judge erred in not affording his counsel further opportunity for in-chambers voir dire because the venireman expressed equivocal views on impartiality. Having reviewed the full transcripts of both the voir dire proceedings and the selection conference, we conclude that the trial judge did not abuse her discretion in refusing to afford Mr. Miller’s counsel an opportunity for additional in-chambers voir dire.[27]
A
The venireman at issue was in the second panel of prospective jurors.[28] During general questioning by the court, the venireman revealed that “a few years ago” he served as the jury foreman on a “murder” case in which the jury returned a “guilty” verdict. During the prosecution’s voir dire, the venireman also acknowledged that he was a resident of New Orleans East, where the murder in the present case occurred. When asked whether he could be fair and impartial, the venireman replied that he did not think so because his younger brother and nephew had both been murdered in the 1990’s. After further questioning about these two prior cases, the prosecution asked: “Okay. And because of that, you’re saying you could not sit and be a fair and impartial juror in this matter? You cannot deliberate?” The venireman testified, “No.”
I^The prosecution later asked all prospective jurors whether they could return a verdict of guilty as charged beyond a reasonable doubt based solely on the testimony of one witness. When asked his opinion, the prospective juror replied: ‘You just have that one?” The prosecution then stated: “Well, we used that example. In other words, if you hear that witness and you say, Look, I believe him beyond a reasonable doubt.” The prospective juror then answered, “I need more facts and things.” The trial judge interjected:
Then you wouldn’t be believing him beyond a reasonable doubt. See, that’s *1094 the problem with this question. You have to get to the point of making belief beyond a reasonable doubt.
What Ms. Petrovich is asking you, once you, in your own deliberations, made the determination that you have believed the evidence has been proven to you to satisfy beyond a reasonable doubt.
And the only evidence State’s presented is witness testimony. Would you be able to come back with a verdict of guilty as charged?
The venireman answered, “I don’t think so.” The trial judge responded: “Even if you are convinced beyond a reasonable doubt? You still have to make that leap. She’s not asking you for a commitment now. She’s just asking you that if you’ve already been convinced beyond a reasonable doubt, could you come back guilty as charged?” The venireman stated, “Maybe.” Later, when asked if he could be a fair and impartial juror knowing that Mr. Miller, if convicted, would be sentenced to life imprisonment, the venireman responded, ‘Yes.” Significantly, the record indicates that defense counsel asked no questions of this venireman during his voir dire of the second panel.
|43The prosecution subsequently challenged the venireman for cause on the grounds that his nephew had been the victim of homicide; Defense counsel objected, recollecting that the venireman said he could still be fair. The trial judge noted that it had in its notes that the venireman could not be fair and impartial “as a result of that” and that it was going to “rely on the transcript.” The court then granted the challenge for cause. The trial judge later granted two additional prosecution challenges for cause, whereupon defense counsel asked to revisit the striking of the venireman in question. Mr. Miller’s counsel also requested that he be allowed to question the venireman in chambers, because it was his recollection that the venireman said that he could be fair and impartial. The trial judge denied the request, stating again that she was “just going to rely on the transcript.” The trial judge then noted Mr. Miller’s objection to her ruling.
B
At the outset we note that a defendant does not have grounds to complain about the granting of a prosecution’s challenge for cause, unless the effect of the ruling is to allow the prosecution to exercise more peremptory challenges than is allowed by law. See La.C.Cr.P., art. 800 B. Here the prosecution peremptorily challenged twelve prospective jurors and successfully challenged eight prospective jurors for cause. Mr. Miller, therefore, has a ground for complaint should it be found that the trial judge erred in excusing the venireman for cause.
_kC
La. Const, art. 1, § 17 provides that a criminal defendant “shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” In the trial of an offense necessarily punishable by imprisonment at hard labor, the defendant and the prosecution shall each have twelve peremptory challenges. See La.C.Cr.P. art. 799. On the other hand, Article 797 provides both the prosecution and a defendant with five grounds for raising a for-cause challenge, two of which were implicated by the prosecution’s challenge of the venireman at issue:
[[Image here]]
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to *1095 a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * *
(4) The juror will not accept the law as given to him by the court.[29]
If a juror expresses a predisposition regarding the outcome of a trial, a challenge for cause should be granted. See State v. Lee, 559 So.2d 1310, 1318 (La.1990). On the other hand, a prospective juror’s seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge’s refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to 14Kdecide the case impartially according to the law and evidence. See State v. Dorsey, 10-0216, pp. 23-24 (La.9/7/11); 74 So.3d 603, 622-623. A trial judge should nevertheless “grant a challenge for cause, even when a prospective juror, declares his ability to remain impartial, if facts revealed from the juror’s responses as a whole reasonably imply bias, prejudice, or the inability to render a judgment according to the law.” Higgins, 03-1980, p. 25, 898 So.2d at 1236.
D
A trial judge is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. See State v. Campbell, 06-0286, p. 73 (La.5/21/08); 983 So.2d 810, 858.
Upon our review of the venireman’s responses during the entire voir dire, we find no abuse of the trial judge’s discretion in either granting the prosecution’s challenge for cause or denying Mr. Miller’s request for additional in-chambers examination. The transcript shows clearly that this venireman first stated that he could not be a fair and impartial juror in a murder trial because of the killings of his brother and nephew. On the other hand, the venireman stated that he could be fair and impartial knowing that Mr. Miller, if convicted, would be sentenced to life in prison without benefit of parole, probation, or suspension of sentence. This juror also stated initially that he could not vote to convict Mr. Miller based upon the testimony of a single witness — an opinion which runs counter to well-established jurisprudence — but then later modified his answer to a “maybe” after |4fiadditional questioning from the trial judge. See Sanchell, 11-1672, p. 6, 103 So.3d at 680.
Mr. Miller places great emphasis on the venireman’s proffered “maybe.” While this sole word might indicate a willingness and ability to decide the case impartially according to the law and evidence, it could just as well indicate a desire to minimize further questions from the prosecution and trial judge.[30] It is difficult, if not impossible, for us — court of review — to infer from a cold record the intent behind this single word. And it is for reasons such as this that we employ the abuse of discretion standard; because “a trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning.” State v. Kang, 02-2812, p. 7 (La. 10/21/03); 859 So.2d 649, 654. The *1096 record before us shows clearly that the trial judge asked questions of this and other prospective jurors and took notes on their respective responses. Indeed, the trial'judge’s comments with respect to this venireman during the selection conference indicate clearly that her refusal to conduct further voir dire was based on her notes and what she recalled the record would show.
Mr. Miller also argues that further voir dire of this venireman was warranted by the seeming contradiction between his stated ability to be fair and impartial in light of Mr. Miller’s potential life sentence if convicted, and his statement that he could not be fair and impartial -with respect to one accused of murder. While, |47again, reiterating that the trial judge was in the best position to evaluate the sincerity and intent behind the venireman’s answers, we observe that the two positions are not as incompatible as might at first appear. If a person acknowledges that they are, from the outset, biased against someone accused of murder, then the fact that the accused will receive a life sentence if convicted should not affect one’s partiality.
Mr. Miller also asserts that the trial judge showed bias against him by virtue of the fact that she allowed the prosecution to recall two other prospective jurors into chambers for further questioning during the selection conference. In one instance, the prosecution made a for-cause challenge against a prospective juror who stated that she could be fair and impartial, despite the fact that she once killed someone in self-defense. The prosecutor stated in conference that she did not hear “that part.” Accordingly, the trial judge allowed the prosecutor to ask the prospective juror further questions in chambers in order to elaborate on the circumstances of her case.[31] After further questioning by the prosecutor, the trial judge denied the challenge for cause.
In the other instance, the prospective juror stated, in response to a prosecution question, that he was acquainted with one of Mr. Miller’s relatives. Neither the prosecution, defense counsel, nor the trial judge asked this prospective juror to elaborate. At the selection conference, the prosecution noted this prospective juror’s response and asked for a chance for further voir dire. The | ^prospective juror was brought into chambers and informed the parties that he had once been a former high school teacher of one of Mr. Miller’s daughters. He also stated clearly that he could serve as a fair and impartial juror despite his acquaintance with Mr. Miller’s daughter. Based on this latter statement, the trial judge denied the prosecution’s challenge for cause.
We have, as noted, reviewed the entire transcript of both the voir dire proceedings and the selection conference, and conclude that the circumstances surrounding the trial judge’s reasons for allowing further voir dire of these other two prospective jurors are distinguishable from the venireman at issue. Simply put, further voir dire in both instances was warranted because the initial round of voir dire failed to fully explain how the prospective jurors could serve fairly and impartially. As the trial judge noted, however, the record indicates that the venireman in question stated that he could not serve fairly and impartially. In view of the trial judge’s enhanced perspective in evaluating the sincerity of the venireman’s answers and body language, *1097 as well as the venireman’s highly equivocal statements with respect to impartiality, we find no abuse of the trial judge’s discretion in granting the prosecution’s challenge for cause of this venireman.
DECREE
We affirm the conviction and sentence of David L. Miller for the violation of La. R.S. 14:30.1, second degree murder.
AFFIRMED.

. None of Mr. Miller’s assignments of error relate to his sentence.

. We note, however, that at Mr. Miller's sentencing hearing, yet prior to the actual imposition of sentence, Mr. Miller’s counsel stated that “after sentencing we will file a Motion for Post-Verdict Judgment of Acquittal.’’ Mr. Miller's counsel then announced that Mr. Miller was ready for sentencing, but the trial judge failed to rule on the motion before imposing sentence. A motion for post-verdict judgment of acquittal raises the question of the sufficiency of the evidence. State v. Taylor, 12-0345, p. 18 (La.App. 4 Cir. 6/26/13); *1075 118 So.3d 65, 77, writ denied, 13-1830 (La.2/28/14); 134 So.3d 1169 (citing State v. Hampton, 98-0331, p. 12 (La.4/23/99); 750 So.2d 867, 880). La.C.Cr.P. art. 821 A further provides that “[a] motion for post-verdict judgment of acquittal must be made and disposed of before sentence." Mr. Miller’s counsel, however, stated that the defense would file the motion "after sentencing.” Such a motion would have been untimely under La. C.Cr.P. art. 821 A. Mr. Miller does not complain about the fact that the trial judge failed to rule on his motion. Rather, Mr. Miller raises sufficiency of the evidence as his first assignment of error — an issue we will address in the body of our opinion. We need not, therefore, address this issue.

. The record reflects that the jury’s verdict was 10-2 in favor of conviction.

.Although Ms. Proctor lived "next door” to him, Mr. Miller disagreed with the 911 operator’s characterization of Ms.- Proctor as his "neighbor.”

. Mr. Cole and Ms. Proctor are not, in fact, related by blood, adoption, or marriage.

. Like the others, Mr. Miller’s second 911 call was recorded and played for the jury.

. The NOPD's incident recall sheet indicates that the responding officers left the scene at approximately 2:52 PM.

. The prosecution introduced photographs of Mr. Miller’s hands, torso, and face, taken by the NOPD shortly after the incident. These photographs do not reveal any apparent scratches, bruises, or cuts to Mr. Miller's person. Neither of Mr. Miller's eyes appears to be damaged, bruised, or swollen. His blue work shirt, which he was wearing when the pictures were taken, appears to be unsullied.

. Mr. Miller stated that he never saw that Mr. Timmons was armed with a weapon.

. When asked on direct examination about Mr. Timmons’s position at the time of the first shot, Mr. Miller stated: "All I know, he was, he was, he was backing up after she said I had the — after she hollered I had the gun. He backed up a couple of times and he, he moved. And that was it. That's all I know.”

. Mr. Miller noted that he did not learn to shoot from a prone position, but rather "was trained to stand and shoot.”

. The NOPD’s incident recall sheet indicates that Mr. Miller called 911 at 3:36 PM.

. The NOPD's incident recall sheet indicates that this call was received by the 911 service at 3:36 PM

.Dr. Defatta's autopsy report and an enlarged body diagram detailing Mr. Timmons’s injuries, were identified by Dr. Defatta and introduced into evidence by the prosecution.

. Dr. Defatta, on the other hand, noted that soot or stippling is occasionally found on clothing and that Mr. Timmons’s body was received without any clothing.

. Mr. Miller did complain of some abdominal pain in the area where he recently had hernia surgery. Ms. Guidry noted that while Mr. Miller asked for some pain medicine to alleviate his abdominal pain, she gave him none as she was not authorized to do so.

. But even if both necessary components are present, that is not always sufficient for the justification of self-defense because not every person is entitled to claim the defense. In *1083 particular, “[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw or discontinue the conflict." La. R.S. 14:21 (emphasis added). Thus, a person who has brought on the difficulty not only must withdraw from the conflict but the withdrawal must be in such a way that the other person "knows or should know” of the desire to withdraw. State v. Wells, 11-744, pp. 11-12 (La.App. 4 Cir. 7/11/14); 156 So.3d 150, 158, petition for cert, filed, 2014-KA-1701 (La. 8/11/14). If the aggressor’s withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-defense for the homicide. It is undisputed in this case that Mr. Timmons was the initial aggressor. There is no impediment, therefore, to Mr. Miller claiming self-defense.

. At a trial, the prosecution is not required to prove beyond a reasonable doubt that a defendant did not act in "sudden passion” or "heat of blood." See Lombard, 486 So.2d at 111 n. 9. Because manslaughter is a responsive verdict or judgment to second degree murder, no evidence of “sudden passion” or "heat of blood" is needed in order for the trier of fact to return a verdict or judgment of guilty of the lesser included offense. See Id. See also State v. Tompkins, 403 So.2d 644, 647-648 (La.1981); State v. Peterson, 290 So.2d 307, 311 (La.1974).

. This burden-shifting framework with respect to a mitigating factor is constitutionally permissible. See Patterson v. New York, 432 U.S. 197, 209-211, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

. When asked on cross-examination how far he was from Mr. Timmons when he began shooting, Mr. Miller told the prosecutor, "[F]rom here to you.” The record suggests that Mr. Miller was referring to the distance between the witness stand and the examiner’s podium. In rebuttal argument, the prosecution characterized that difference, without defense objection, as eight feet. We note, however, that arguments of counsel are not to be taken as evidence. See State v. Casey, 99-0023, p. 17 (La. 1/26/00); 775 So.2d 1022, 1036.

. The record indicates that Mr. Miller did not ask the jury to return a verdict for the lesser-included offense of manslaughter. Rather, the tenor of his entire defense was that his actions were justified because they were taken in self-defense. Similarly, the prosecution does not ask us to deny Mr. Miller's alternative argument because of the Ju-luke principle. And while one could make a case that Juluke should be employed by us to disregard Mr. Miller’s alternative argument, we are not convinced that it should apply in this case. We perceive a fundamental difference between Mr. Juluke — who advanced an alibi defense before this Court that he did not present to the jury — and Mr. Miller, whose jury was instructed specifically by the trial judge that they were empowered to return a responsive verdict of the lesser-included offense of manslaughter should they be convinced that the evidence failed to establish Mr. Miller’s guilt beyond a reasonable doubt for second degree murder, but nevertheless established guilt beyond a reasonable doubt for manslaughter.

. Mr. Miller, however, testified that Mr. Tim-mons remained standing — and even walked towards him — after the shooting.

. In Higgins, the Supreme Court determined that no rational fact-finder could find from a single eyewitness’s testimony that a killing occurred during either an armed robbery or an attempted armed robbery, and consequently there was insufficient proof to support a conviction for first degree murder, but a rational fact-finder could find from that same eyewitness's testimony that the defendant intentionally killed the victim. See 03-1980, p. 17, 898 So.2d at 1232.

. We have examined the trial judge's instructions to the jury regarding ‘ justifiable homicide and note that her definition of the concept properly follows the definition given in La. R.S. 14:20 A.

. We observe that Detective Aucoin’s definition is more favorable to Mr. Miller than the actual provisions of La. R.S. 14:20 A, which formed the basis for the trial judge's subsequent jury instruction, because it did not include the requirement that one must also reasonably believe that he is in imminent danger and that the killing is necessary to save himself from that danger.

. The Supreme Court in Wheeler ruled it improper for the prosecution to ask a police officer, testifying at trial as an expert, for an opinion about the defendant's guilt, after the prosecution posed a hypothetical situation for the officer to consider in reaching his opinion.

. Since "a reviewing court is charged with determining whether the trial judge’s denial of a defense challenge for cause was an abuse of the trial judge’s broad discretion, the reviewing court should scrutinize the entire voir dire record as a whole.” Higgins, 03-1980, p. 29, 898 So.2d at 1237-1238.

. Ten jurors were selected from the first panel.

. La.C.Cr.P. art. 798 also provides the prosecution with several additional bases with which to lodge for-cause challenges. These grounds, however, are not implicated by Mr. Miller's assignment of error.

. We, again, note that Mr. Miller’s counsel asked no questions of this prospective juror.

. The prospective juror explained that she had been the victim of domestic violence and that the Grand Jury returned a no-true bill.