LBAGNERIS, Judge.
Reginald Santinac (“Santinac”) was charged by bill of indictment on June 25, 1998, with second degree murder, a violation of La. R.S. 14:3o.[1] At his arraignment on June 30th, he pled not guilty. The trial court found probable cause and denied the motions to suppress the identification and statement on October 16th. After trial on November 24 th, a twelve-member jury found Santinac guilty as charged. He was sentenced on December 3 l'd to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant’s motion for reconsideration of sentence was denied, and his motion for an appeal was granted.
At trial Officer Gregory Clay testified that at about 7:30 p.m. on December 3, 1997, he responded to a call concerning a shooting at 2012 Elysian Fields Avenue. There, he found a woman leaning over her husband, who was stretched out on the ground. The woman told the officer that a man named “Reginald” had shot her husband.
Dr. William E. Newman, an expert in clinical pathology, testified that he performed the autopsy on Raymond Offord (“Offord”) on December 4, 1997. Offord suffered two gunshot wounds to the chest. One wound was in the right chest where bthe bullet went through the right lung, hit the thoracic vertebra, and was deflected into the lower lobe of the right lung. Dr. Newman recovered that bullet from *1135 the lung. The other gunshot entered the middle chest, and went through the vena cava (one of the main veins), the pulmonary artery, and the lower lobe of the left lung before exiting the body. Dr. Newman said that Offord died as a result of bleeding into his chest from the two gunshot wounds. Offord’s body fluids were tested for drugs and proved to be negative for alcohol but positive for cannabinoid. The doctor explained that the victim could have been exposed to marijuana anytime within the last few days before his death.
Mrs. Nicole Offord (“Mrs Offord”), a nursing student, testified that she was married to the victim Raymond Offord for nineteen months. She said she and her husband • had known the defendant very casually for about seven years because his grandmother lived very near Mrs. Offord’s grandfather. Mrs. Offord said that on the evening of December 3 rd, she and her husband ate dinner and then went by her grandfather’s house to check on him because he was alone. As they drove up to the house at 2012 Elysian Fields Avenue, they noticed Santinac standing on his grandmother’s porch across the street. She observed him going into his grandmother’s house as she and her husband entered her grandfather’s house. The couple remained in the house only a few minutes because Mrs. Offord’s grandfather was asleep. As they walked out of the house, she realized Santinac was standing on the third step leading up to her grandfather’s house. Mrs. Offord testified that Santinac said to her husband, “Can I talk to you for a second, bro?” Offord agreed to talk, and Mrs. Offord walked down the steps and to the car. She watched as they walked down the steps and stopped to talk. She said they started arguing and their words became louder. She described the escalation of conversation into a fight:
13Reginald (Santinac) and my husband were arguing. I didn’t hear the whole conversation of the argument. Reginald was saying something about my husband left him in the Sixth Ward. My husband was saying he didn’t know what he was talking about. Reginald kept saying, “Yes, you do, bro. You do. You left me.” My husband kept saying, “No, I don’t.”.... Reginald kept saying, ‘Tes, you do.”.... And he [Reginald] shoved him [Offord] and my husband shoved him back and it turned into a fight, and which led quite close to going to the street and Reginald pulled out the gun and shot him three times.
Mrs. Offord observed the scuffle, and then she saw Santinac shoot Offord from a distance of six feet.[2] Mrs. Offord said her husband owned a gun, but it was in a safe in the attic; he was not carrying it when he was shot. After the shooting Mrs. Of-ford went inside to call the police. She noticed a bicycle near the front steps as she went into the house; when she came out, the bike was gone. She said that Santinac went to his grandmother’s house after the incident. Mrs. Offord identified Santinac in the courtroom and named him as the man who shot her husband.
Detective David Hunter served as primary investigator of this incident. He testified that he arrived on the scene at 7:53 p.m., and Officer Clay briefed him. The detective collected a bullet projectile, a hat, and a neck chain with a crucifix from the scene. He spoke with Mrs. Offord who was very upset. Based on that conversation, he determined that Santinac was a suspect. A photographic lineup was prepared and shown to Mrs. Offord; she selected Santinac’s picture. An arrest warrant for Santinac was issued, and on May 3, 1998, he was arrested. When asked about the shooting, Santinac said that although he was on the scene that night, he did not shoot the victim. He said that a man on a bicycle rode by and shot over his shoulder and [¿then biked away. The detective said that no weapons were found on the victim at the scene or when he was taken to the hospital.
*1136 Reginald Santinac, the twenty-four year old defendant, testified that he was raised by his grandmother who lives at 1935 Elysian Fields Avenue. He stated that he has known Mrs. Offord’s grandfather for about seven years. On December 3 rd as the couple got out of the car, Offord signaled him to come over, and he spoke with Of-ford there as he often has. Santinac explained that they were in the cocaine business together. Santinac further explained that he owed Offord about $2000 for cocaine. When they started to talk, Offord said, “You think I’m playing. You think this is a game.” They started to fight, and Offord pulled up his T-shirt to show that a black nine-millimeter gun was in his waistband. Santinac claimed he fired because he saw Offord “attempting to pull out a gun.” He admitted that he usually carries a gun. Santinac explained that he was on the run for five months after the incident because he dreaded “turning ... [his] life over to somebody.” When asked why he told the story of another man on a bike riding by and shooting Offord instead of explaining that he shot in self-defense, Santinac said he “didn’t want to implicate” himself.
Before addressing the assignment of error, we note that Santinac suggests that the trial court’s failure to advise him of the prescriptive period for post conviction relief is an error patent. La.C.Cr.P. art. 930.8 C provides that at sentencing, the trial court shall advise the defendant of the prescriptive period for seeking post conviction relief. La.C.Cr.P. art. 930.8 C is supplicatory language and does not bestow an enforceable right upon an individual defendant. State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189.
In what he deems another error patent, Santinac claims that the trial court | Rdenied him credit for time served, which credit is mandated by La.C.Cr.P. art. 880. In State v. Dennis, 98-1016, pp. 3-4 (La.App. 4 Cir. 9/22/99), 753 So.2d 298-99, this Court stated:
The Code currently provides that a defendant shall receive credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. In 1970 this article was amended to substitute “shall” for “may,” so that the credit was no longer discretionary. In 1997, the article was amended to substitute “A defendant shall receive” for “The court, when it imposes sentence, shall give.” According to the Official Revision Comment, this article “makes the credit for prior custody self-operating even on a silent record. It does not change the law.” [Footnote omitted]. Thus, although the sentencing transcript and minute entry are silent on the issue, the appellant nevertheless shall receive the credit.
In State v. Dennis, supra, this Court noted that the commitment form provided that the defendant shall receive credit for time served. Yet the trial court did not specify the dates for which the credit should be given. This Court concluded that the defendant could pursue his claim for credit for time served by application for post conviction relief if the Department of Corrections failed to give him credit. The case at bar is similar to State v. Dennis in that the trial court did not state that Santinac would receive credit for time served, and the dates he was in custody are not on the commitment form, although the form indicates that he shall receive the credit. Thus Santinac, if denied the credit, should pursue this claim in post conviction relief.
In a single assignment of error, Santinac complains that the evidence was insufficient to support a conviction for second degree murder. He argues that the evidence indicates the homicide was manslaughter.
The standard for reviewing a claim of insufficient evidence is whether, after [¿viewing the evidence in the light most favorable to the prosecution, a rational trier fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, *1137 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989).
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1 A(l). Manslaughter is a homicide that would be either first or second degree murder, but the killing is committed in “sudden passion or heat of blood caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(l). “Sudden passion” and “heat of blood” are not separate elements of the offense but are mitigating factors that exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). Because they are mitigating factors, the defendant must establish them by a preponderance of the evidence. State v. Heck, 560 So.2d 611 (La.App. 4th Cir.1990), writ denied 566 So.2d 395 (La.1990).
Here Santinac did not establish by a preponderance of the evidence that the killing of Offord was committed in “sudden passion” or “heat of blood.” The only |7evidence of provocation came from Santi-nac himself, and the jury, in finding him guilty of second degree murder, must not have found his testimony as to what transpired between him and Offord to be credible. Santinac claimed to have seen a gun on Offord. However, Offord’s wife testified that he was not carrying a gun, and no gun was found on his body or on the premises. Furthermore, Santinac shot the victim twice, and then he fled and remained in hiding for five months. His recounting of the incident to the police was not a description of an act committed in the “heat of blood” or “sudden passion,” but a denial of his involvement in the shooting. It is clear that the jury did not believe his testimony at trial. We fail to find this credibility determination to be an abuse of discretion.
Accordingly, for reasons cited above, Santinac’s conviction and sentence are affirmed.

CONVICTION AND SENTENCE AFFIRMED.

. The defendant was also charged with another count of second degree murder. The charges were severed for trial, and he pled guilty to the reduced count of manslaughter; he was sentenced to serve twenty-five years at hard labor.

. The victim was shot twice; whether Mrs. Offord was mistaken about the three shots or whether one bullet missed the victim was not brought out at trial.