STATE OF LOUISIANA       *       NO. 2023-KA-0386

VERSUS       *

      COURT OF APPEAL

JOEL G. LEHMANN       *

      FOURTH CIRCUIT

      *

      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 20-00862 C\W C/W 999-01459, DIVISION "B"
Honorable Jeanne Nunez Juneau, Judge
* * * * * *
**Judge Karen K. Herman**
* * * * * *
(Court composed of Judge Roland L. Belsome, Judge Sandra Cabrina Jenkins,
Judge Karen K. Herman)

**JENKINS, J., CONCURS IN THE RESULT**

Perry Michael Nicosia
DISTRICT ATTORNEY OF ST. BERNARD PARISH
Justin W. Stephens
ASSISTANT DISTRICT ATTORNEY OF ST. BERNARD PARISH
1101 W. St. Bernard Highway
Chalmette, Louisiana 70043

      COUNSEL FOR STATE OF LOUISIANA

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, Louisiana 70073-2333

      COUNSEL FOR DEFENDANT

**CONVICTION AND SENTENCE AFFIRMED**
**FEBRUARY 5, 2024**

KKH
RLB

The defendant, Joel G. Lehmann ("Mr. Lehmann"), appeals his conviction for the first-degree murder of his stepfather, Richard Scott ("Mr. Scott"). For the reasons set forth below, we affirm.

**PROCEDURAL HISTORY**

On March 11, 2020, Mr. Lehmann was charged, by bill of indictment, with committing the January 17, 2020 first-degree murder of Mr. Scott, a violation of La. R.S. 14:30. On July 14, 2020, the state informed the court that it would not seek the death penalty, and Mr. Lehmann entered a plea of not guilty.

On August 21, 2020, Mr. Lehmann filed a motion to determine his competency to stand trial. He was found competent to stand trial, and on August 23, 2022, Mr. Lehmann amended his plea to not guilty and not guilty by reason of insanity.

After a four-day jury trial, Mr. Lehmann was found guilty as charged on February 16, 2023. On March 27, 2023, he was sentenced to life imprisonment at hard labor without the possibility of parole, probation, and suspension of sentence.

On appeal, Mr. Lehmann asserts that the evidence was insufficient to uphold a conviction for first degree murder. More specifically, Mr. Lehmann argues that

1

the state did not meet its burden of proving that the shooting was not committed in self-defense.

**STATEMENT OF FACT**

At trial, Mr. Lehmann's mother, Darlene Scott ("Mrs. Scott"), testified that she was married to Mr. Scott for twenty-two years. On January 17, 2020, she lived with her son and Mr. Scott at 6415 East St. Bernard Highway in Violet, Louisiana. She stated that Mr. Lehmann had almost always lived with her.[1]

On January 17, 2020, Mr. Lehmann was unemployed. Mr. Scott was employed repairing and restoring antique furniture. Ms. Scott stated that her son and his stepfather always had a good relationship, "until the later years." Ms. Scott never saw the two men engage in a physical altercation.

On the morning of the incident, Ms. Scott woke up and got ready for work. Mr. Scott and Mr. Lehmann remained at home. At about 2:00 p.m., she called Mr. Scott to let him know that she was leaving work, but had an errand to run. He did not answer the phone, so she left a message.

Ms. Scott arrived at home at approximately 4:00 p.m. to find Mr. Scott lying on the dining room floor in a pool of blood. She touched him to see if he had a pulse, but she felt none. She discovered a bullet hole in his chest and then called 911. She screamed her son's name "because [she] knew he did it," and then walked through the house. In the master bedroom, she found a shovel on her bed and saw two bullet holes in the wall as she walked toward the bathroom. In Mr. Lehmann's room, she found her husband's cell phone, as well as his gun, ammunition, crossbow, and arrows.[2] Ms. Scott stepped outside and realized Mr.

---

[1] Mr. Lehmann was thirty-six years old at the time.

Scott's truck was gone.  As she re-entered the house, the police arrived.  Ms. Scott also discovered a bullet hole in the dining room wall.

The state played Ms. Scott's 911 call and introduced a series of still photographs of the scene, which Ms. Scott testified accurately depicted what she observed that day.  Nothing was out of place in the house except for the shovel on her bed and one chair that appeared to have fallen next to Mr. Scott's body.

Ms. Scott stated that on January 21, 2020, she received a telephone call from her son, who was being held in Orleans Parish Prison.  During the call, he told her he has "psychosis."  When asked for her understanding of Mr. Lehmann's mental health history, Ms. Scott testified:

> He started having issues where he was saying that he was hearing voices. He said that he had somewhere, somehow got a chip — somebody put chip in him and he started hearing voices. He was constantly wearing headphones, basically, 24/7. He started talking about he was God, and he was King Tut, his grandfather was the King of England, just various things of that nature.
>
> I had tried to bring him to the doctor on multiple occasions to no avail. Usually it was a hospital. And when you go into the hospital, they check you in and you have a seat, and then they do what they do, and they'll call you back into the back when they're ready. Well, every time we'd go, before I could get him into the back, "I'm out of here." He's gone, you know. And so we'd leave.
>
> There was one time he actually called me and told me that he was actually going to catch the bus to go to the hospital on his own. So I thought maybe, you know, he'd stay long enough this time since he's actually taking himself, you know, to be evaluated. And so he proceeded to the hospital. He called me when he got there and called me later. They had sent him to a place off of St. Charles. I don't recall it off the top of my head, but they sent him from the hospital to this facility off of St. Charles. And he ended up calling me back. And he says, "Mama, come get me. I done jumped the fence and left." So, again, he — I don't know if they actually evaluated him at all or what, but — so he was — he was having issues, you know, before this happened.

---

[2] Ms. Scott explained that her husband kept his gun and ammunition in their bedroom dresser; it was never in Mr. Lehmann's room.  Mr. Scott's crossbow was kept in her craft room.

Regarding Mr. Lehmann's behavior during the week leading up to the incident, Ms. Scott stated:

> [H]e never left the house. He didn't have a phone, had no friends. He stayed in his room unless he was going smoke a cigarette, which is not allowed in my house — you have to go outside — so he'd go in and out of the house, you know, to smoke. He'd come out to eat and, of course, go to the bathroom. But other than that, he was in his room with his headphones on.

Ms. Scott testified that Mr. Lehmann never exhibited violent tendencies. She said that he used drugs from his late teens until two years prior to the homicide. She testified that she never actually witnessed her son hearing voices, and she was unaware of any formal diagnoses.

Ms. Scott recounted an episode that occurred a couple of weeks before the incident. She testified that her daughter's son, Hayden, visited from Arkansas over the Christmas holidays. Mr. Scott told Hayden not to touch his recently-purchased crossbow, which he kept on a table in Ms. Scott's craft room.

During Hayden's visit, Ms. Scott made a gift for him at her craft table. To make room on the table for his grandmother to work, Hayden moved Mr. Scott's crossbow and placed it in a closet, out of the way. When Mr. Scott later noticed that his crossbow had been moved from the craft table, he became angry and telephoned Hayden, who left the house to visit other relatives, and screamed at him for moving the bow.

On cross-examination, Ms. Scott testified that two years before the homicide, her son was becoming more paranoid, hearing voices and feeling like people were watching and following him. She stated that in 2019, about four months before the murder, she and her daughters sought an order of commitment

4

from the coroner. However, Mr. Lehmann was released; the doctor told her, "I don't see anything wrong with your son."

On re-direct examination, Ms. Scott testified that it is possible that her son exaggerated his mental health issues. She explained that given what she saw inside that day, *i.e.*, the shovel, a brick, the gun and the ammunition, it seemed to her that the murder was planned. However, she also stated that she believed her husband's murder was a "crime of passion." She explained:

> My son and – my son and myself have always been close. My son has almost lived with me his entire life. And it's just how I feel. It's my point of view on it. But I know my son loves me and I love him. And I feel that he felt that my husband was in the way. I could be wrong. That's just my point of view.

She believed her son's mental health issues may have played into that.

Ms. Scott further testified that her husband had issues with Mr. Lehmann because of her son's unemployed status. Her husband believed that Mr. Lehmann needed to get a job and move on with his life. She did not think her son liked that idea of Mr. Scott putting his two cents in because that was getting in the way of Ms. Scott taking care of him.

Major Mark Jackson ("Major Jackson"), Assistant Chief of Detectives with the St. Bernard Parish Sheriff's Office ("Sheriff's Office"), testified that he first came in contact with Mr. Lehmann on January 18, 2020, outside of the University Medical Center in New Orleans. Officers from the New Orleans Police Department ("NOPD"), one of whom wore a body camera, were also present, and Mr. Lehmann was read his *Miranda* rights. The body-cam video, which depicts the officers' encounter with Mr. Scott was played for the jury.

On cross-examination, Major Jackson testified that Mr. Lehmann acknowledged that he understood his rights, but there was no doctor present to

5

evaluate his mental state at the time. He stated that during the encounter, Mr. Lehmann did not talk to himself or say that he had a chip in his head.

Detective Sargent Daniel Carreras ("Detective Carreras") testified that he was assigned to investigate the case. He stated that the Sheriff's Office was dispatched to 6415 East St. Bernard Highway in response to a call reporting an unresponsive white male lying in a pool of blood on the dining room floor. When officers arrived, the St. Bernard Fire Department and an Acadian EMS unit were already on the scene.

While on the scene, Detective Carreras learned from Ms. Scott that Mr. Lehmann and Mr. Scott's truck were missing from the residence. An alert was issued for the truck. License plate recognition cameras detected the truck heading outbound on St. Claude Avenue. The Sheriff's Office then notified law enforcement in New Orleans and Slidell of the incident. The state introduced two photographs taken from St. Bernard Parish's license plate recognition system of Mr. Scott's truck headed west on St. Bernard Highway at 2:12 p.m. and exiting St. Bernard Parish at 2:19 p.m. on January 17, 2020.

Later that day, Detective Carreras was contacted by an NOPD officer who advised that Mr. Scott's truck had been located in the 300 block of North Peters Street in New Orleans. It bore a sticker dated January 17, 2020, reflecting that it had been immobilized with a boot. The state introduced photographs of the vehicle, including a photograph of the truck's interior which depicted three empty beer cans and one unopened can.

Detective Carreras testified that he first came in contact with Mr. Lehmann on January 19, 2020, the day he took Mr. Lehmann's videotaped statement at the Criminal Investigations Bureau. Detective Carreras stated that during the

6

interview, Mr. Lehmann never mentioned that he was having any type of mental health issues. The hour-long videotaped statement was played for the jury.

Detective Carreras testified that he obtained photographs from a Chevron station on St. Bernard Highway. The photographs, which depicted Mr. Lehmann after the homicide, were introduced into evidence. Mr. Lehmann was carrying a six-pack of beer as he walked to Mr. Scott's truck.

The state also introduced the affidavit for Mr. Lehmann's arrest, as well as warrants to extract Mr. Lehmann's blood and to search Mr. Lehmann's and Mr. Scott's cell phones.[3] Finally, a body-cam video from an officer at the crime scene was introduced into evidence. Detective Carreras stated that the video accurately depicted the scene.

The state introduced an evidence property bag containing Mr. Lehmann's personal belongings obtained by the Orleans Parish Sheriff's Office. One item, in particular, was Mr. Lehmann's underwear containing dry blood stains.

Detective Carreras testified that he attended Mr. Scott's autopsy and took custody of a blood sample, as well as two bullets, one of which had been removed from Mr. Scott's chest, and one from his back. Detective Carreras stated that a gunshot residue test on Mr. Scott was not performed because, after questioning Mr. Lehmann, there was no evidence that Mr. Scott fired a weapon. On cross-examination, Detective Carreras conceded that a positive residue test on Mr. Scott could possibly have shown whether Mr. Scott and Mr. Lehmann were in close proximity to each other when the gun was fired.

Gina Mire, Ph.D. ("Dr. Mire"), a licensed clinical forensic psychologist, testified as an expert in the field of forensic clinical psychology. She testified that

---

[3] Detective Carreras stated that nothing of evidentiary value was collected from either cell phone.

she was trained specifically in the assessment and treatment of individuals with mental disorders who are in the legal system.

Dr. Mire conducted an evaluation to assess whether, at the time of the crime, Mr. Lehmann suffered from a mental disease or defect such that he was incapable of distinguishing between right and wrong. In connection with her evaluation, Dr. Mire met with Mr. Lehmann on three occasions for a total of three to four hours. She interviewed Ms. Scott, viewed Mr. Lehmann's video statement, viewed videos from Mr. Lehmann's cell phone, and considered Mr. Lehmann's prior medical records.[4] Dr. Mire was made aware that Mr. Lehmann did engage in bizarre behaviors such as talking to himself, believing he had a chip in his head, and hearing voices. She felt that the voices Mr. Lehmann described were more like his thoughts. He did not describe hearing voices when he killed Mr. Scott.

Dr. Mire opined that Mr. Lehmann did not suffer from a mental disease or defect at the time of the commission of the crime and that she did not believe he was unable to determine right from wrong relative to his conduct on that day. She testified that on all three occasions of interviewing Mr. Lehmann, he demonstrated an ability to be logical and rational, and there was never a concern that he had any type of delusional thinking or any type of ongoing hallucinations.

Dr. Craig Troxclair ("Dr. Troxclair") testified as an expert in forensic psychiatry. He met with Mr. Lehmann on four occasions between 2020 and 2022. Based on his observations, as well as his review of various records and interviews, Dr. Troxclair prepared a report in which he opined that Mr. Lehmann was able to distinguish right from wrong in relation to his actions.

Under cross-examination Dr. Troxclair read the following from his report:

---

[4] Mr. Lehmann's medical records were introduced into evidence.

At the time of the offense, the defendant was likely suffering from a mental illness best described as cannabis use disorder and a likely psychotic disorder, the symptoms of which he may have been attempting to minimize. At the time of the offense, the defendant was able to distinguish right from wrong in relation to his actions. His possible symptoms of auditory hallucinations and delusions of having a chip in his brain appeared to have been unrelated to the issues that led to his actions toward his stepfather, but may have impaired his judgment.

On re-direct, Dr. Troxclair explained that a person can have impaired judgment, but still know right from wrong.

Detective Edward Delery ("Detective Delery"), a crime scene investigator with the Sheriff's Office, testified that he collected and documented evidence from the Scott residence, including a revolver, casings, and blood swabs. He also took photographs, which were introduced into evidence.

Chelsee Richardson ("Ms. Richardson"), a firearms examiner employed by the Louisiana State Police Crime Lab, testified as an expert witness in the area of firearms examination. Ms. Richardson examined Mr. Scott's .38 Special Taurus revolver, cartridge cases retrieved from the scene, and two bullets which were removed from his body during the autopsy. Ms. Richardson testified that the two bullets removed from Mr. Scott's body were fired from the .38 Special Taurus revolver, and that the cartridge cases also came from the same gun.

Srivatcha Naragoni ("Ms. Naragoni"), a DNA analyst with the Louisiana State Police Crime Lab, testified as an expert in forensic DNA analysis. Ms. Naragoni testified that Mr. Scott was the donor of the blood on the muzzle, trigger hammer, and grip portions of the .38 Special Taurus revolver, as well as on the blade of the shovel and Mr. Scott's underwear. On cross-examination, she stated that she did not know if the blood on Mr. Lehmann's underwear got there from Mr. Scott laying on top of Mr. Lehmann when Mr. Scott fell to the floor.

9

Mary-Kate Parker ("Ms. Parker"), a blood and urine toxicology analyst with the Louisiana State Police crime lab, testified as an expert in the field of toxicology. Ms. Parker stated that she received Mr. Lehmann's blood alcohol kit which included two tubes of blood and a container of urine. Based on her examination, she prepared a toxicology analysis report which reflected recent use of THC (tetrahydrocannabinol).[5] She testified that, while her testing showed that Mr. Lehmann had smoked THC "at some point," it had been "broken down," and she could not say when he smoked it.

Dr. Greg Fernandez ("Dr. Fernandez"), the Coroner of St. Bernard Parish, testified as an expert in emergency medicine. Dr. Fernandez testified that multiple gunshot wounds caused the Mr. Scott's death. The autopsy protocol reflected a gunshot wound to the right neck and a blunt laceration to the top of the head. The gunshot wound to Mr. Scott's right neck caused right ear injuries, vertebral body fractures, left lung perforation, and a rib fracture. [6]

Dr. Fernandez testified that the protocol also reflected a second gunshot wound, entering on the left, upper chest wall. The bullet which caused the second gunshot wound hit a main artery of the heart, went through the heart, and damaged Mr. Scott's other lung. Dr. Fernandez testified that the effect of the second gunshot wound was "catastrophic." He explained that a third gunshot wound caused soft tissue injuries, and a fourth gunshot wound entered and exited the left, upper back, also causing soft tissue injuries.[7]

---

[5] The toxicology analysis report was introduced into evidence.
[6] The autopsy protocol was introduced into evidence.
[7] Dr. Fernandez explained that the numbering of the gunshot wounds did not suggest the order in which the bullets hit Mr. Scott's body. He could not make an assumption as to the sequence of the shots.

Dr. Fernandez explained that the first gunshot wound, left untreated, was not survivable. He also stated that Mr. Scott would not have survived the second gunshot, even five minutes; it was too bad of an injury.

Mr. Lehmann's January 19, 2020 videotaped statement was presented to the jury. It demonstrated the following:

At the outset, Mr. Lehmann was read his rights. He signed the "Rights of an Arrestee or Suspect" form, indicating that he understood and waived his rights. He also verbally confirmed that he understood his rights and told Detective Carreras that he wanted to speak to him.

Mr. Lehmann began the interview by announcing that he had been having some problems dealing with his stepfather. He said that Mr. Scott had been acting different lately. He began describing an incident in which his teenaged nephew visited about a week-and-a-half earlier. He said that his nephew picked up Mr. Scott's new crossbow, which was on a table in Ms. Scott's craft room.

Abruptly ending his description of that incident, Mr. Lehmann stated that on the day of the shooting, he moved the crossbow while Mr. Scott was not home. When Mr. Scott returned home and noticed that Mr. Lehmann moved the crossbow, Mr. Scott started screaming how Mr. Lehmann and his nephew were always touching his things. Mr. Scott continued to scream that he would kill Mr. Lehmann if he touched one more of his things.

Mr. Lehmann said that he was getting scared. He went to the back yard to "smoke a cigarette and cool down for a minute." While outside, he became concerned that Mr. Scott had the crossbow and had a pistol in his room. He was afraid that Mr. Scott might try to shoot him. Mr. Lehmann said that he grabbed a

shovel from the back yard, intending to hit Mr. Scott if Mr. Scott tried to shoot him.

Mr. Lehmann stated that when he went back inside, he saw Mr. Scott go toward the gun drawer. He said that he held the shovel over Mr. Scott and directed him to get on the ground. Mr. Scott complied and, while he was on his knees in the bathroom, Mr. Lehmann grabbed Mr. Scott's gun out of the drawer. He then grabbed Mr. Scott's phone from him. Mr. Lehmann stated that Mr. Scott charged him, and he hit Mr. Scott on top of the head with the shovel. Mr. Scott continued to charge him, and he shot him in the chest. Mr. Lehmann stated that he shot Mr. Scott three or four times.

Mr. Lehmann explained that he backed out of the bathroom and Mr. Scott ran at him again so he had to shoot him again. Mr. Lehmann ran out of the bedroom and turned around. Mr. Scott tackled him and he shot Mr. Scott again. He then had to climb out from under Mr. Scott. Mr. Lehmann went back to the bedroom and grabbed the box of bullets out of the drawer, just in case. He went to his bedroom and reloaded the gun. Mr. Lehmann stated that he then "made sure [Mr. Scott] was dead." Once he saw Mr. Scott was "still dead," he washed his hands and wiped off the gun.

Mr. Lehmann went back to his room. He sat the gun down and took Mr. Scott's keys and truck. He drove to the store, purchased beer, and then went to the French Quarter. He knew his mother would return home, but he did not want to wait at the house for her. He also explained that he did not want to sit with a dead body, and he did not want the "police coming." He thought about "skipping town." Mr. Lehmann stated that he had never been so scared before.

12

Mr. Lehmann told Detective Carreras that he spoke to his mother from Orleans Parish Prison, where he was held before his transfer to the St. Bernard Parish jail. He said that he "told her everything that happened, so they have another confession, or whatever, on the phone."

In response to questioning from Detective Carreras, Mr. Lehmann stated that he was not drinking and was not intoxicated. With the exception of marijuana, he had not done any drugs in weeks, and in particular, he had not "done meth" in about eight months.

Mr. Lehmann said that Mr. Scott surrendered his marijuana, wallet, and his keys while he held a gun on him. He said he wished there had been a way for him to have avoided the whole situation. He explained that the shooting was not planned, it just happened. He perceived that he was in danger and had no other choice. Detective Carreras asked Mr. Lehmann why he did not use a phone at the convenience store where he purchased beer, and he answered, "I don't know, I freaked out."

Mr. Lehmann insisted that there was no animosity between him and his stepfather. According to Mr. Lehmann, Mr. Scott had never yelled at him before. They had engaged in little arguments, but Mr. Scott had never threatened to kill him.

Detective Carreras stepped out of the room for a few minutes and returned with Lieutenant Melerine, who conducted further questioning. Mr. Lehmann recounted the events leading up to the shooting, albeit with slight variations. He first explained that his nephew was involved in a separate incident concerning the crossbow about two weeks earlier, but that he was not present in the house on the day of the shooting.

13

Mr. Lehmann again explained that on January 17, 2020, Mr. Scott came home and noticed his crossbow had been moved. He accused Mr. Lehmann of moving it and said he was going to kill Mr. Lehmann and his nephew. Mr. Lehmann stated that he first tried to get away from the situation by going outside. He brought the shovel inside with him "just in case."

Mr. Lehmann went back inside and placed the shovel on his bedroom floor. Mr. Scott started continuing on about the crossbow. He told Mr. Lehmann he needed to get a job. He told Mr. Lehmann to stop touching his stuff or he "was going to put a bullet in his head."

Mr. Scott then went outside. At that time, Mr. Lehmann took the crossbow from the craft room and brought it into his bedroom, where he placed it on the floor. Mr. Lehmann then went into Mr. Scott's room and removed the pistol from a drawer.

Mr. Lehmann said that when Mr. Scott entered the house, he noticed the crossbow was missing. Mr. Scott started cursing him. Mr. Lehmann followed Mr. Scott into the back master bathroom. With the shovel in one hand and the gun in the other, Mr. Lehmann ordered Mr. Scott to get on the ground. Mr. Scott obeyed, getting down on one knee. Mr. Lehmann then demanded his phone. Mr. Scott complied and also gave Mr. Lehmann his wallet, marijuana, and the keys to his truck. Mr. Lehmann said he hit Mr. Scott on the head with the shovel, intending to knock him out and use Mr. Scott's phone to call the police. However, Mr. Scott got up and charged at him. He said he shot Mr. Scott in the shoulder. When Mr. Scott charged out of the bathroom, he shot him again. Mr. Scott kept coming and Mr. Lehmann turned toward the kitchen and ran. He shot Mr. Scott again in the

kitchen. He then had Mr. Scott in a headlock, shot him again, and had to crawl out from underneath Mr. Scott's body.

Lieutenant Melerine advised Mr. Lehmann that his investigation had revealed that he and Mr. Scott argued a lot. He reminded Mr. Lehmann that, at no point, did Mr. Scott have a weapon; the two were engaged in a verbal argument until Mr. Lehmann armed himself. Lieutenant Melerine stated that Mr. Lehmann, was the only one with weapons, and had the "upper hand" at all times." He told Mr. Lehmann that he attended the autopsy and learned that Mr. Scott was hit very hard with the shovel.

Lieutenant Melerine also told Mr. Lehmann that he spent hours in the house investigating the murder. Countering Mr. Lehmann's suggestion that a physical altercation had occurred, Lieutenant Melerine said he observed that nothing in the small, neat house was out of place, and not even dust on surfaces in the house had been disturbed. He reminded Mr. Lehmann that Mr. Scott was on his knees in a cornered area and was never armed. Mr. Lehmann responded, "I was in fear for my life. That's all I can really say."

Mr. Lehmann told the officers that when he left the Chevron station, he drove to the French Quarter. He walked along the Riverwalk, went in some shops, and used the men's room. He then returned to his truck, where he sat and drank a couple of beers. From there, he walked through the French Quarter and purchased a drink with Mr. Scott's money. Around 3:00 a.m., he checked into a Holiday Inn, also paid for with Mr. Scott's money. He woke up at around 10:00 a.m. and walked to University Hospital, where he did not sign in. Mr. Lehmann said felt he would be safe there.

Mr. Lehmann took the stand at trial and testified that he had convictions for unauthorized entry of an inhabited dwelling and purse snatching. He stated that he was sorry that he killed his stepfather and that he loved him very much. He further testified that he was in fear of his life on the day he killed Mr. Scott.

On cross-examination, when asked why he did not just leave the house, Mr. Lehmann answered:

> The thought never occurred to me to leave. I was — when the situation took place, I was overwhelmed with fear and maybe adrenaline, and I just acted out of protection for myself. Like, I don't know. The thought to leave the house or leave the area didn't happen. Like, I wasn't processing information the way you normally would. Like, I was — I don't know. I can't explain exactly what I thought or felt at the time because it happened so fast, but I didn't have time to stop and have, like, a conscious thought of what to do or how to do it. You know, it just — it just unfolded. Before I realized really what happened, it was over with.

When asked how he could be in fear for his life, when he had already removed Mr. Scott's crossbow and revolver, he stated, "[o]nce again, I was acting out of fear, and I wasn't making conscious decisions to sit there and rationalize what the right thing to do in that moment is." Finally, Mr. Lehmann testified that he did not see a weapon on Mr. Scott at any point.

**ERRORS PATENT**

Pursuant to La. C.Cr.P. art. 920[8], we have reviewed the record for errors patent and have found none.

---

[8] La. C.Cr.P. art. 920 provides:

The following matters and no others shall be considered on appeal:

(1) An error designated in the assignment of errors; and

(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

16

**DISCUSSION**

In his sole assignment of error, Mr. Lehmann asserts that the evidence presented at trial was insufficient to sustain his first-degree murder conviction because the state failed to prove that the homicide was not committed in self-defense based on Mr. Lehmann's reasonable fear that Mr. Scott would kill him for touching his crossbow.

The state counters that Mr. Lehmann's claim is contradicted by Ms. Scott's testimony that there was no record of physical violence between Mr. Lehmann and Mr. Scott and by evidence that Mr. Scott was unarmed throughout the entire incident. The state further asserts that if Mr. Lehmann believed that he was in imminent danger, he had the opportunity to remove himself from the scene.

The United States Supreme Court provided the standard for review of a claim of insufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation and footnote omitted):

> …[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution [emphasis in original].

As this Court further explained in *State v. McGinnis*, 2019-0381, pp. 10-11, (La. App. 4 Cir. 3/11/20), 364 So.3d 172, 180:

> Under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), when analyzing the sufficiency of evidence, the reviewing court must view the evidence in the light most favorable to the prosecution and analyze whether any rational trier of fact could have found that the State proved its case beyond a

17

reasonable doubt. *State v. Brown*, 03-0897, p. 18 (La. 4/12/05), 907 So.2d 1, 22. "[T]he rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams,* 11-0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771. The existence of conflicting statements as to factual matters affects the weight of the evidence, not its sufficiency, and such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306. "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id*., 10-1338, p. 5, 64 So.3d at 306. On appeal, a reviewing court must consider the record as a whole, as that is what a rational trier of fact would do. *State v. Santinac*, 99-0782, p. 6 (La. App. 4 Cir. 6/14/00), 765 So.2d 1133, 1137.

La. R.S. 14:30(1) defines first-degree murder, in pertinent part, as the killing of a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . armed robbery…"[9]

Pursuant to La. R.S. 14:18, "[t]he fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct [under certain circumstances]." A homicide is justifiable "when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1).

However, "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he

---

[9] The bill of indictment does not reflect the underlying armed robbery as the basis for the first-degree murder charge. At the outset of trial, the jury received preliminary instructions that Mr. Lehmann was charged with first degree murder when he was engaged in the perpetration or attempted perpetration of armed robbery, and at the conclusion of trial, the jury also received instructions which reflected that Mr. Lehmann was charged with committing first degree murder when he was engaged in the perpetration or attempted perpetration of armed robbery.

desires to withdraw and discontinue the conflict." La. R.S. 14:21; *See also State v. Bethley,* 2022-0849, p. 6 (La. App. 4 Cir. 6/21/23), 368 So.3d 1148, 1154.

"When a defendant asserts that he acted in self-defense in a homicide case, it is settled law that the state bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. DeGruy*, 2016-0891, p. 18 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 733 (citations omitted).

In this case, a review of the record demonstrates that the state proved beyond a reasonable doubt that Mr. Lehmann specifically intended to kill or inflict great bodily harm on Mr. Scott during the perpetration of an armed robbery. Mr. Lehmann's statement to Detective Carreras reflects that after having engaged in a verbal altercation with Mr. Scott, he stepped outside and smoked a cigarette. At that time, Mr. Lehmann armed himself with a shovel. After re-entering the house, Mr. Lehmann additionally armed himself with a loaded revolver that he took from Mr. Scott's dresser. Armed with both weapons, Mr. Lehmann confronted Mr. Scott in a bathroom in the back of the house and demanded that he get on his knees and relinquish his cell phone. Mr. Scott complied. Trapped in the bathroom with Mr. Lehmann positioned over him with a shovel and a loaded revolver, Mr. Scott relinquished not only his phone, but his wallet and the keys to his truck.

After Mr. Scott complied with the demands, Mr. Lehmann struck him on the head with the shovel with enough force to cause a laceration. When Mr. Scott started to rise, Mr. Lehmann fired his first shot into Mr. Scott. Mr. Lehmann continued shooting until he emptied the revolver in the kitchen area. At that point, Mr. Lehmann believed Mr. Scott was dead. Nevertheless, Mr. Lehmann reloaded the gun just in case Mr. Scott was alive. The shooting ended only when Mr. Lehmann confirmed that Mr. Scott was dead. The coroner testified that Mr. Scott

19

died from the gunshot wounds, and the firearms examiner confirmed that the shots were fired from Mr. Scott's own gun.

The state also carried its burden of proving that Mr. Lehmann did not act in self-defense. The only evidence offered to support the self-defense claim was Mr. Lehmann's own self-serving statement that he killed Mr. Scott because he was in fear for his life. However, Mr. Lehmann admitted that Mr. Scott was unarmed at all times. As explained above, Mr. Scott was assaulted in a back bathroom, with no means to escape, when Mr. Lehmann confronted him with a shovel and a loaded revolver and demanded that he kneel and give up his cell phone. After Mr. Lehmann took Mr. Scott's cell phone, wallet, and keys, he struck Mr. Scott with the shovel. Mr. Lehmann then shot Mr. Scott twice in the bedroom and again in the kitchen area, until he was sure Mr. Scott was dead.

Mr. Lehmann asserts that he was in imminent fear that Mr. Scott would kill him and, that the very real threats, coupled with his mental health issues, made his fear reasonable. However, there were no "very real threats" imminently directed at Mr. Lehmann. In Mr. Lehmann's self-serving statement, he stated that Mr. Scott screamed that he would kill Mr. Lehmann if he touched another of Mr. Scott's things. That purported threat was not imminent; it was predicated on Mr. Lehmann continuing to touch Mr. Scott's belongings.

Evidence of Mr. Lehmann's mental health struggles was presented to the jury. Two mental health experts testified that Mr. Lehmann did not suffer from a mental disease or defect and that he knew right from wrong at the time of the homicide. Ms. Scott testified that it was possible that Mr. Lehmann exaggerated his mental health issues. Further, she believed that her son may have planned the

20

murder, based on his perception that Mr. Scott obstructed Mr. Lehmann's ability to manipulate his mother.

Finally, based on Mr. Lehmann's own statements, it is evident that he was the aggressor, and there is no evidence that he ever attempted to withdraw from the conflict with Mr. Scott. Thus, pursuant to La. R.S. 14:21, we find that his self-defense claim was reasonably rejected by the jury.

**CONCLUSION**

Based on the above, we affirm Mr. Lehmann's conviction and sentence for the first-degree murder of Mr. Scott.

**CONVICTION AND SENTENCE AFFIRMED**